## KIMBALL LAUNDRY CO. v. UNITED STATES.

### No. 13494.

Circuit Court of Appeals, Eighth Circuit.

March 11, 1948.

William J. Hotz, of Omaha, Neb. (Hotz & Hotz, William J. Hotz, Jr., and William F. Dalton, all of Omaha, Neb., on the brief), for appellant.

Wilma C. Martin, Atty., Department of Justice, of Washington, D. C. (A. Devitt Vanech, Asst. Atty. Gen., and Joseph T. Votava, U. S. Atty., and Roger P. Marquis, Atty., Department of Justice, both of Omaha, Neb., on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

The United States, in order to provide laundry and dry cleaning services for members of its armed forces, on November 21, 1942, filed a petition in condemnation under Section 201 of Title II of the Second War Powers Act of March 27, 1942, c. 199, 56 Stat. 176, 177, 50 U.S.C.A. Appendix, § 632, to acquire the right to the temporary use and occupancy of the Kimball Laundry in Omaha, Nebraska, until June 30, 1943, and, at the election of the Secretary of War, from year to year thereafter during the emergency.[1] The Kimball Laundry was a large, modern, long-established, profitable and fully equipped laundry and dry cleaning establishment owned and being operated by the appellant, Kimball Laundry Com-

---

[1] The petition states:

"That the Secretary of War, pursuant to the authority in him vested by said Acts of Congress, has found and determined that it is necessary and advantageous, and to the interest of the United States to acquire by condemnation, under judicial process, for public use for military and defense purposes, the following described property, to-wit:

"The right to use and occupy the property known as the Kimball Laundry, owned and operated by the Kimball Laundry Company, a corporation, located at 1504 Jones Street, Omaha, Nebraska, consisting of the real estate known as the East 22 Feet of Lot 7, and all of Lot 8, Block 171, Original City of Omaha, and a strip one foot wide adjoining the aforesaid real estate on the North, all of said real estate being in the City of

pany. The stock of the Company and the management of its affairs were in the hands of the Jacobberger family.

The District Court granted the Government immediate possession of the laundry, and on November 22, 1942, it took over the entire plant, machinery and equipment (except delivery equipment), and, with A. L. Jacobberger (secretary and operations manager of the Company) as superintendent and about 95% of the Company's 185 employees, commenced operating the plant as a military laundry.

The Company, having no means of serving its patrons, went out of business for the duration of the Government's use and occupancy of the plant. The Secretary of War extended the term of occupancy for one year from June 30, 1943, and each year thereafter until June 30, 1946.[2]

A Board of six appraisers, appointed by the District Court in conformity with Nebraska practice, reported on November 19, 1943, "that the just compensation for the value of the use of the premises taken by the United States of America is the sum of $74,940 per annum, or the sum of $6,245 per month, and we find that said monthly rental was payable on the 21st day of each and every month, commencing on the 21st day of November, 1942, and that all delinquent monthly rentals shall bear interest at the rate of five per cent per annum until paid, to be paid said respondent, Kimball Laundry Company, by the United States of America." The appraisers also reported

that they recognized that at the time of the return of the property to the Company there would be damage for loss of patrons, but that a majority of the Board had found that the damage could not be appraised at the time their report was made. The Government and the Company both took appeals from the award of the appraisers.

The trial for the ascertainment of the "just compensation" due the Company began on March 4, 1946, before a jury, and ended March 19, 1946. The Company contended that the Government, while ostensibly taking only the right to use and occupy the laundry, had in legal effect taken all of the Company's physical assets and its business as well, including its trade routes and customers, and was obligated to pay the full market value of what was taken, estimated to be approximately $1,-000,000. The Company also contended that if the rental or use value of its laundry was to be used to measure compensation, evidence of the value of its trade routes and customers was admissible as an element of value.

The Government asserted that just compensation was to be measured by the market rental or use value of the laundry during the period in suit, plus the cost of restoring the plant and machinery to the condition in which they were on November 22, 1942.

The District Court was in accord with the Government's theory as to the proper basis for determining just compensation.

---

Omaha, Douglas County, Nebraska, together with the improvements situate thereon, and also all the personal property located thereon and therein, and used in connection with said laundry, excepting only the delivery equipment.

"That the estate sought to be taken for said public use of the aforesaid rights to use and occupy said property is a terminable estate ending June 30, 1943, and at the election of the Secretary of War for additional yearly periods thereafter for the duration of the present emergency as determined by the President of the United States, subject, however to existing easements for public roads and highways, for public utilities, for railroads and for pipe lines."

[2] The record shows that on May 11, 1943, the term was extended to June 30,

1944; that on June 19, 1943, the Government deposited in court $30,140, estimated compensation to June 30, 1943; that on April 6, 1944, the Government deposited $50,000, estimated compensation for the year ending June 30, 1944; that on May 31, 1944, the term was again extended to June 30, 1945, $50,000 of estimated compensation being deposited on August 10, 1944, to cover that extension; that the term was again extended on May 28, 1945, to June 30, 1946, and that on August 8, 1945, $65,000 of estimated compensation for that extension was deposited. The Company was permitted to withdraw the deposits of compensation without prejudice to its claims. The Government surrendered possession to the Company on March 23, 1946, after the termination of the trial of this case.

The court's rulings and its instructions to the jury were in substantial conformity with that theory.

The jury by its verdict, filed March 20, 1946, determined that the compensation due the Company for the use and occupancy of its laundry for 3.6 years (November 22, 1942, to June 30, 1946) was $297,776.03, consisting of use or rental value of $70,000 per annum, or $252,000 for the term, and $45,776.03 additional compensation for failure to return the property in the same condition as it was on November 22, 1942. Judgment was entered on the verdict. The court added interest at 6% (1) from November 22, 1942, until paid, on the amount adjudged due for the use of the laundry from November 22, 1942, to June 30, 1943, and (2) upon the amount due each year thereafter from the beginning of that year until paid, giving credit to the Government for the sums deposited as estimated compensation. Interest was also added from March 20, 1946, until paid, on the sum of $45,776.03 awarded for failure to return the property in the same condition as when taken.

On March 23, 1946, the Government returned the laundry to the Company, and on June 11, 1946, the Government paid into court $98,124.27, the amount required to satisfy the judgment. The Company was permitted by the court to withdraw $75,000 of this sum without prejudice to the Company's right of appeal.

For the purposes of this case, we shall assume, without deciding, that under § 258a of Title 40 U.S.C.A., the Company could accept $75,000 of the amount which the Government had deposited in court to satisfy the judgment, without waiving the right to challenge its validity.

■ In the Company's brief, "Points Relied upon for Reversal" are numbered from I to XXXII. They relate to the instructions of the court and to rulings with respect to pleadings and evidence. Most of them are not argued in the brief and virtually all of them reflect the divergence of views of counsel for the Company and those of the trial court relative to the proper standards for ascertaining just compensation. An unargued assertion of error is no more helpful to an appellate court than is an unsupported allegation of fact to a trial court. The burden of demonstrating error is upon an appellant,[3] and errors assigned, but not argued in his brief, are waived.[4]

In its brief, under the heading "Statement of the Case," the Company says:

"At the outset appellant believes this statement of the case would be lacking if counsel neglected to now state that errors are assigned principally for the failure of the court to permit the introduction of competent evidence as to the fair market value of the corporation assets as a going concern with its existing established trade routes at the time of taking on November 22, 1942, and to instruct the jury accordingly. Instead, the trial court took the position during the trial that just compensation should be measured only as interest at some per cent on the intrinsic value of the land, on the intrinsic value of the building, and on the intrinsic value of the machinery, and so instructed the jury, and excluded other evidence offered as to fair, reasonable market value. Evidence of estimated cost of repairing damaged property was permitted by government agents unfamiliar with the actual damages. The government did not repair or restore the damages to appellant's property. Its agents merely estimated what it would cost to place machinery, etc., again as it was on November 22, 1942."

It thus appears that the Company complains mainly of (1) the standards adopted for measuring just compensation, and (2) the evidence of the Government relating to the probable cost of repairing or restoring the damage to the plant and machinery attributable to the Government's use and occupancy.

---

3 Marin v. Ellis, 8 Cir., 15 F.2d 321, 322; In re Schulte-United, Inc., 8 Cir., 59 F.2d 553, 559; Metropolitan Life Ins. Co., v. Armstrong, 8 Cir., 85 F.2d 187, 195.

4 Denver Live Stock Commission Co. v. Lee, 8 Cir., 18 F.2d 11, 13, 14 and cases cited; Schevenell v. Blackwood, 8 Cir., 35 F.2d 421, 422; American Ins. Co. v. Scheufler, 8 Cir., 129 F.2d 143, 145.

The Company, in its brief, argues four "Propositions of Law." We shall discuss them in their order.

The first proposition is stated as follows:

"When all the physical assets of a going business, such as a laundry and dry cleaning corporation, are condemned for the purpose of governmental operation of the same business for the exclusive use of the army, thus putting the condemnee corporation out of business entirely, the fair, reasonable market value to the corporation as a going concern on the date of the taking forms the proper legal basis upon which to measure such just compensation. The established laundry trade routes, when so proven to have a readily ascertainable value on the market, form a part of the composite fair market value on the date of taking. These routes are distinguished from the noncompensable items of good will, loss of profit, and loss of further business. If it is proven that these routes would be destroyed as a natural consequence known to the condemnor as a direct and proximate result of the taking of the physical plant owned by the condemnee, their value forms a part of the total value of the compensable property taken. The refusal of the trial court to receive competent evidence offered to prove such value is reversible error."

We cannot accept this proposition as the law. The Government took exactly what it purported to take, namely, the temporary use and occupancy of the Company's laundry. The Government did not take or intend to take, and obviously could not use, the Company's business, trade routes or customers. No doubt the Government's occupation of the plant disrupted and damaged the Company's business, although it could hardly have destroyed the demand for laundry service in the city of Omaha or disabled the Company from ever re-establishing its business. If the taking of the temporary occupancy of the Company's laundry were to be given the effect of the taking of fee title to the laundry, it is certain that the damage done to the Company's business would not be compensable under the Fifth Amendment.[5]

It cannot successfully be argued that the opinion of the Supreme Court in United States v. General Motors Corporation, 323 U.S. 373, page 383, 65 S.Ct. 357, page 362, 89 L.Ed. 311, 156 A.L.R. 390 contains implications that all consequential damages proximately caused by the taking of temporary occupancy of a building may be proved "not as independent items of damage but to aid in the determination of what would be the usual—the market—price which would be asked and paid for such temporary occupancy of the building then in use * * *." This, because the Court also said in that opinion (page 383 of 323 U.S., page 362 of 65 S.Ct.):

" * * * Proof of such costs [necessary costs to condemnee for removal of personal property, its storage and its return] as affecting market value is to be distinguished from proof of value peculiar to the respondent [condemnee], or the value of good-will or of injury to the business of the respondent which, in this case, as in the case of the condemnation of a fee, must be excluded from the reckoning."

In the case of United States v. Petty Motor Co., 327 U.S. 372, pages 379, 380, 66 S.Ct. 596, page 600, 90 L.Ed. 729, which involved the taking of the leaseholds of tenants in addition to taking the temporary use of a fee, the Court, in distinguishing that case from the General Motors case, said:

" * * * There is a fundamental difference between the taking of a part of a lease and the taking of the whole lease. That difference is that the lessee must return to the leasehold at the end of the Government's use or at least the responsibility for the period of the lease, which is not taken, rests upon the lessee. * * * Because of that continuing obligation in all

---

[5] United States v. Petty Motor Co., 327 U.S. 372, 377, 378, 66 S.Ct. 596, 90 L. Ed. 729; United States v. General Motors Corporation, 323 U.S. 373, 379, 380, 383, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390; United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 281, 282, 63 S.Ct. 1047, 87 L.Ed. 1390; Mitchell v. United States, 267 U.S. 341, 345, 45 S.Ct. 293, 69 L.Ed. 644; Joslin Manufacturing Co. v. City of Providence, 262 U.S. 668, 675, 43 S. Ct. 684, 67 L.Ed. 1167; Bothwell v. United States, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238.

takings of temporary occupancy of lease-holds, the value of the rights of the lessees, which are taken, may be affected by *evidence of the cost of temporary removal.* [Italics supplied.]"

In the instant case, had the Government taken the temporary use of the building alone, and had the Company been required to remove its machinery and equipment, and to store them and then return them to the building at the end of the Government's term, the necessary cost of so doing, as bearing on the question of the market value of the use and occupancy taken, could, no doubt, have been proved and considered.

■ Where the right to temporarily use and occupy property is the interest taken, just compensation is the value on the market of the use and occupancy (United States v. Petty Motor Co., supra page 377 of 327 U.S., page 599 of 66 S.Ct., 90 L.Ed. 729), but evidence of loss of profits, damage to good will, and other such consequential losses must be excluded in determining market value. Id., pages 377, 378 of 327 U.S., page 599 of 66 S.Ct.

■ The compensation contemplated by the Fifth Amendment is the market rental value of the temporary use and occupancy taken. United States v. General Motors Corporation, supra, pages 382, 383 of 323 U.S. page 361 of 65 S.Ct. 89 L.Ed. 311, 156 A.L.R. 390. In effect, the Government takes a lease and is obligated to pay as rent the full market rental value of the property occupied. In addition, the owner, as the constructive lessor, is entitled to additional compensation for any destruction, damage and depreciation in value of the property occasioned by its temporary use. Id., pages 383, 384 of 323 U.S., pages 361, 362 of 65 S. Ct. The Government, as the constructive lessee, obligates itself to return the property in as good condition as when received, "ordinary wear and tear and damage by the elements alone excepted."

The District Court did not err in excluding evidence as to the value of the Company's trade routes and customers or going business.

The Company's second "Proposition of Law" is as follows:

"Where the trial court rejects or receives evidence which adversely affects a substantial and material right of a party litigant the cause should be reversed and remanded."

Under this proposition, the Company states that witnesses were permitted to testify who did not see or know the property as it was in 1942, and knew nothing of its value at any time; that the formula used by the Government's witness Weber formed no adequate basis for determining just compensation; that there was competent evidence of fair rental value, but that it was nullified by the court's instructions.

■ The District Court's charge is not a model of conciseness or accuracy. It contains statements which standing alone are subject to criticism, such as: "With these considerations in mind, how are we going to find the fair rental value for the use of this property? There does not seem to be anyone qualified to help us reach that figure. We must approach it, however, from such evidence as we can obtain." Taking the charge as a whole, however, we think it adequately apprised the jury of the applicable law and the considerations upon which a verdict could lawfully be based, and did not nullify the pertinent evidence admitted. Moreover, after listening for two weeks to conflicting estimates and opinions as to fair rental value and as to damages to and deterioration of the plant and machinery attributable to the Government's use, the jury could hardly have had any illusions as to the issues of fact which were presented by the evidence. So far as the record shows, no attempt was made by the Government, during the trial, to minimize the usefulness or capacity of the laundry or to show that it was not completely equipped and in profitable operation when taken over by the Government. It insisted, however, that the Company was not entitled to have loss of trade routes and customers, expenses of litigation, and other consequential damages, considered in determining just compensation for the use and occupancy of the laundry.

■ The market rental value of the laundry and the damage and deterioration resulting from its use by the Government

had to be estimated. There was no actual market for the temporary use and occupancy of laundries. The men employed by the Government to estimate rental value and damage to machinery and equipment were competent and qualified to do that work. Their testimony was admissible. Their credibility, the weight of their testimony, and the soundness of their opinions were for the jury to evaluate. Svenson v. Mutual Life Ins. Co. of New York, 8 Cir., 87 F.2d 441, 445, and cases cited. "After a witness has testified that he knows the property and its value, he may be called upon to state such value. The means and extent of his information, and therefore the worth of his opinion, may be developed at length on cross-examination." Montana Railway Co. v. Warren, 137 U.S. 348, 354, 11 S.Ct. 96, 98, 34 L.Ed. 681. Whether an expert witness is qualified to testify is primarily a question for the trial judge, whose determination can be upset only for an abuse of discretion. Love v. United States, 8 Cir., 141 F.2d 981, 983, and cases cited. The fact that many of the Government's experts on value or on damage to equipment and machinery had not seen the laundry in 1942 did not disqualify them to testify to their estimates of its value at that time. They had heard the condition of the plant and machinery fully described, and assumed that it was in either good or first-class condition at the time the Government took over.

The Company's "Proposition of Law No. III" is:

"The conduct of a case in condemnation under the federal statute shall be governed by the laws of the state in which the condemned property is located."

■ .The contention made is that loss to a business occasioned by a taking of property under the power of eminent domain is compensable in Nebraska. What constitutes property and what is just compensation under the Fifth Amendment is not a question of Nebraska law, but of federal law. State of Nebraska v. United States, 8 Cir., 164 F.2d 866, 867, 868.

■ The Company refers also to the refusal of the court to permit the introduction, in rebuttal, of evidence proffered to show that the estimates of Government witnesses as to the amounts required to restore the laundry to its former condition were too low. The testimony rejected was a part of the Company's main case. The order of proof on a trial is largely within the discretion of the trial court. Philadelphia & Trenton Railroad Co. v. Stimpson, 14 Pet. 448, 462, 463, 39 U.S. 448, 462, 463, 10 L.Ed. 535; Wills v. Russell, 100 U.S. 621, 626, 25 L.Ed. 607; 53 Am.Jur., Trial, §§ 115, 116, pages 101-104. There was no such abuse of discretion in rejecting the Company's proffered evidence as would warrant a reversal.

The Company's "Proposition of Law No. IV" is as follows:

"When payments for just compensation are delayed, additional compensation measured by 6% of the total amount ultimately found due from the date of the taking must be as a matter of law added to the judgment, with credit for the amounts paid with 6% added to date of ultimate judgment."

Section 258a of Title 40 U.S.C.A. provides: "* * * and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court." The Company contends that, since the ultimate award was $297,776.03, interest should run at 6% on the entire amount from November 22, 1942, until the date of payment of the judgment, without including, however, interest on sums deposited as estimated compensation.

■ The question presented is not free from doubt. From a realistic viewpoint, what the Government took on November 22, 1942, was the right to use and occupy the laundry to June 30, 1943. The Government, at the end of that period, took an extension of the term for one year, and in the years 1944 and 1945 took additional yearly extensions. The right of the Company to compensation for use and occupancy, for each period taken, we think, ac-

crued at the commencement of the period. The Company's right to damages for injuries to and deterioration of its property, attributable to Government use, accrued at the end of the total term. The Government was obligated to return the property at the end of the term in substantially as good condition as when taken, or to then pay the costs of restoration. We believe that in a case such as this it was not the intention of Congress that the total award, made up of annual rental payments and costs of restoration, should draw 6% interest from the date the Government first went into possession.

The Company contends that it is also entitled to 6% interest "on $34,875.50 for supplies taken by the Government on November 22, 1942; paid July 8, 1943." We find no evidence in the record to support this assertion.

The jury's verdict was well within the evidence. While the total award was much less than the amount claimed by the Company, it exceeded by about $40,000 the highest estimate made by any Government expert witness.

Our conclusion is that the judgment reflects all elements of value which lawfully might be considered in determining the issue of the just compensation to which the Company was entitled, and that no errors of law were committed by the trial court which would warrant a reversal.

The judgment is affirmed.