246 F.2d 231
 CHAIN INSTITUTE, Inc.; American Chain & Cable Company, Inc.; The McKay Company; Hodell Chain Company; St. Pierre Chain Corporation; S. G. Taylor Chain Company; Columbus McKinnon Chain Corporation; Campbell Chain Company; Nixdorff-Krein Manufacturing Company; Peerless Chain Company; The John M. Russell Manufacturing Company, Inc.; Turner & Seymour Manufacturing Company; Western Chain Products Company; Dennis A. Merriman; William D. Kirkpatrick; and George J. Campbell, Jr., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 14821.
 United States Court of Appeals Eighth Circuit.
 July 3, 1957.
 
 Sumner S. Kittelle, New York City (Cann, Lamb, Long & Kittelle, New York City, Frazer F. Hilder, Washington, D. C., Stephen H. Beach, Wilkie, Owen, Farr, Gallagher & Walton, Beekman & Bogue, New York City, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, Ohio, Sidley, Austin, Burgess & Smith, Chicago, Ill., Marsh, Day & Calhoun, Bridgeport, Conn., Lawrence, Goldberg, Lawrence & Lewin, Chicago, Ill., Finck & Huber, Buffalo, N. Y., Halfpenny & Hahn, Chicago, Ill., Frederick B. Gerber, York, Pa., and Charles Fay, New York City, on the briefs), for petitioners.
 J. B. Truly, Attorney, Federal Trade Commission, Washington, D. C. (Earl W. Kintner, General Counsel, and Robert B. Dawkins, Asst. General Counsel, Federal Trade Commission, Washington, D. C., on the briefs), for respondent.
 Before SANBORN, JOHNSEN and VOGEL, Circuit Judges.
 SANBORN, Circuit Judge.
 
 
 1
 This case comes to this Court upon petitions to review a cease and desist order of the Federal Trade Commission[1] which is based upon its determination that the petitioners had conspired to bring about uniformity in prices for chain and chain products, in violation of Section 5 of the Federal Trade Commission Act.[2]
 
 
 2
 The petitioners are: the principal manufacturers of chain and chain products in the United States; the trade association of which they are members; and certain of the officers of the association. The Commission on December 22, 1942, issued a complaint charging them with having conspired to fix and maintain identical delivered prices for such products. Delivered prices are those charged by a seller for his goods when and where delivered. On October 9, 1945, the Commission issued an amended complaint which contained two counts. The first count charged the petitioners with conspiring, in violation of § 5 of the Federal Trade Commission Act, to fix identical delivered prices for their respective products by the use of the same delivered pricing methods, which are referred to as (1) a basing point system, (2) a freight equalization system, and (3) a zone system; and thereby preventing the forces of competition from making and determining price quotations. The second count of the amended complaint charged the petitioners with price discrimination, in violation of § 2(a) of the Clayton Act, as amended.[3] That count was ultimately dismissed by the Commission. The petitioners denied all of the material allegations of the amended complaint. Evidence was heard by a Trial Examiner designated by the Commission. The hearings commenced in April of 1946 and continued through 1947 and into 1948. The record evidence was closed July 7, 1948. The Trial Examiner filed his recommended decision on September 23, 1948. It was later amended in some particulars. The case was argued before the Commission, on exceptions to the Trial Examiner's report, on April 7, 1949; was reargued September 22, 1950; and was finally decided by the Commission adversely to petitioners on the first count February 16, 1953, by a vote of 3 to 1, Commissioner Mason dissenting and Commissioner Carretta not participating. The cease and desist order under review was entered on the same date. In addition to the dismissal of the second count, the amended complaint was also dismissed as to several individuals who had been joined as parties. The record evidence necessarily reflects conditions in the chain industry as they existed prior to July 1948.
 
 
 3
 The petitioners on April 20, 1953, filed their "Joint and Several Petition to Review" the order of the Commission. The John M. Russell Manufacturing Company, Inc., and Turner & Seymour Manufacturing Company, who were parties to the joint petition, filed a supplemental petition to review the order, asserting, in effect, that there was no adequate evidentiary basis for a finding that they had participated in a conspiracy to fix prices. They asked that the relief prayed for in the joint petition be granted. The petitioners originally all sought a complete review and reversal of the Commission's findings and order. On June 17, 1954, they (with the exception of the two petitioners who had filed the supplemental petition and the Columbus McKinnon Chain Corporation) moved this Court for leave to withdraw their challenge to the Commission's findings and order with respect to the price fixing conspiracy charge, except as such findings and order bore upon the use of the delivered pricing methods.
 
 
 4
 The cease and desist order of the Commission prohibited broadly a continuation of the price fixing conspiracy which the Commission had found to exist. Included in this part of the order was a subparagraph numbered (6) requiring the petitioners who make or deal in chain to cease and desist from entering into or continuing any common course of action, agreement or conspiracy to
 
 
 5
 "Quote or sell chain or chain products at prices calculated or determined pursuant to or in accordance with the single basing point delivered-price system, the freight equalization delivered-price system, or the zone delivered-price system; or quote or sell chain or chain products at prices calculated or determined pursuant to or in accordance with any other plan or system which results in identical price quotations or prices for chain or chain products at points of quotation or sale or to particular purchasers by any two or more sellers of chain or chain products using such plan or system or which prevents purchasers from finding any advantage in price in dealing with one or more as against another seller."
 
 
 6
 In addition, the Commission included in the order a third ordering paragraph. That paragraph required each of the corporate petitioners to
 
 
 7
 "cease and desist from quoting or selling chain or chain products at prices calculated or determined pursuant to or in accordance with a single basing point delivered-price system, a freight equalization delivered-price system, or a zone delivered-price system, for the purpose or with the effect of systematically matching the delivered-price quotations or the delivered prices of other sellers of chain or chain products and thereby preventing purchasers from finding any advantage in price in dealing with one or more sellers as against another."
 
 
 8
 The validity of both of these paragraphs of the order is challenged as being without adequate evidentiary support and exceeding the powers of the Commission.
 
 
 9
 The case was argued and submitted to this Court at its March Session 1956. The Court of Appeals for the Seventh Circuit had just decided the case of National Lead Co. v. Federal Trade Commission, 227 F.2d 825, which also involved an alleged conspiracy to fix prices. The Commission in its cease and desist order in that case had included a paragraph similar to the third ordering paragraph in this case, forbidding the respondents there involved "from quoting or selling lead pigments at prices calculated or determined in whole or in part pursuant to or in accordance with a zone delivered price system for the purpose or with the effect of systematically matching the delivered price quotations or the delivered prices of other sellers of lead pigments and thereby preventing purchasers from finding any advantage in price in dealing with one or more sellers as against another." 227 F. 2d at page 840. The Seventh Circuit ruled that that paragraph of the order was invalid. See pages 840-844 of 227 F. 2d. In his argument, in the instant case, counsel for the Commission conceded that if that ruling was correct, the corresponding paragraph in the order under review here could not be sustained. Moreover, Commissioner Mason, who had dissented in both the National Lead Co. case and this case, had said in his dissenting opinion, with respect to the order now under review: "The order in this case, like the order in Docket 5253, National Lead Company, et al., goes further than to suppress practices found to be unlawful." We therefore deferred decision pending final disposition of the National Lead Co. case, in which the Supreme Court granted certiorari. That Court on February 25, 1957, in Federal Trade Commission v. National Lead Co., 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438, ruled that it was within the power of the Commission, under the evidence in that case, to include the paragraph corresponding to the third ordering paragraph in the instant case.
 
 
 10
 After the decision of the National Lead Co. case by the Supreme Court, the parties here, at our invitation, filed supplemental briefs relative to the effect, if any, of that decision upon the questions which we are called upon to decide, and specifying what those questions are.
 
 
 11
 The petitioners in their supplemental brief say that the Supreme Court merely decided in the National Lead Co. case that the Commission had basic statutory authority to include in its order a paragraph of the type there in question, forbidding the use of a single delivered pricing system, and that, as narrowly interpreted, the paragraph in that case was not an inappropriate remedy under the peculiar facts.
 
 
 12
 In our opinion, there are three questions requiring determination: (1) The validity of the prohibition contained in subparagraph (6) of the first ordering paragraph, prohibiting the continued use, pursuant to conspiracy, of the three delivered pricing systems. (2) The validity of the third ordering paragraph, prohibiting the individual independent use of any of the three delivered pricing systems "for the purpose or with the effect of systematically matching" delivered prices of competitors, with the effect of eliminating competition. (3) Whether there was an adequate evidentiary basis for the finding of the Commission that Columbus McKinnon Chain Corporation was a participant in the alleged conspiracy to fix prices.
 
 
 13
 The petitioners in their supplemental brief say that Turner & Seymour Manufacturing Company and The John M. Russell Manufacturing Company, Inc., as well as Columbus McKinnon Chain Corporation, have challenged the entire findings, conclusions and order. The latter company has filed a brief. Neither of the other two has briefed or argued its assertions of error. As was said in Kimball Laundry Co. v. United States, 8 Cir., 166 F.2d 856, 859, "An unargued assertion of error is no more helpful to an appellate court than is an unsupported allegation of fact to a trial court. The burden of demonstrating error is upon an appellant, and errors assigned, but not argued in his brief, are waived." See, also, Turner County, S. D., v. Miller, 8 Cir., 170 F.2d 820, 828.
 
 
 14
 Since the petitioners do not challenge the adequacy of the evidence to sustain the Commission's determination of the existence of concerted action by the petitioners, amounting to conspiracy, to fix the prices for chain and chain products, it is unnecessary to attempt to state the evidence in detail. What the petitioners contend is that there was no evidence that the delivered pricing methods used in the sale of the chain or chain products resulted from any conspiracy, understanding, agreement or concerted action on the part of the petitioners.
 
 
 15
 There is no doubt of the power of the Commission to declare that conduct which tends to restrain trade by fixing prices is an unfair method of competition. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 693, 68 S.Ct. 793, 92 L.Ed. 1010. Within broad limits, it is for the Commission to prescribe the remedy for the prevention of such conduct, which may include depriving those who have engaged in it of the weapons which they used in making it effective. Federal Trade Commission v. National Lead Co., supra, at pages 428-430 of 352 U.S., at pages 508-510 of 77 S.Ct. See, also, Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081.
 
 
 16
 The instant case strongly resembles the Cement Institute case, Aetna Portland Cement Co. v. F. T. C., 7 Cir., 157 F.2d 533, reversed in Federal Trade Comm. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1009; the National Lead Co. case, 227 F.2d 825, reversed in part 352 U.S. 419, 77 S.Ct. 502; and the case of Triangle Conduit & Cable Co., Inc., v. Federal Trade Commission, 7 Cir., 168 F.2d 175, affirmed by an equally divided Supreme Court under the title, Clayton Mark & Co. v. Federal Trade Commission, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110. The only important distinction between the instant case and those cases, it seems to us, is that here three delivered pricing systems are involved, and in each of the other cases only one was involved.
 
 
 17
 The record shows that the three delivered pricing systems or methods were used in selling chain. Welded chain (heavy-duty chain such as anchor chain, logging chain and the like) was sold under the old "Pittsburgh plus" method of delivered pricing, which called for the f. o. b. mill or factory price plus freight based on Pittsburgh. The method is described in the Cement Institute case at pages 697-698 of 333 U.S. at pages 801-802 of 68 S.Ct.
 
 
 18
 Weldless chain (which is lighter than welded chain and is made by bending and knotting wire into links or by cutting links from flat metal) was sold under the freight equalization method of computing delivered pricing. Under this system the buyer pays the seller's mill or factory price plus an amount equal to the rail freight applicable to the shipment from the factory, in which such chain is made, nearest freightwise to the point of delivery.
 
 
 19
 Tire chain (which consists of two welded line or side chains with cross links and is used on the wheels of motor vehicles to prevent skidding on or in snow, ice or mud) was sold f. o. b. factory with freight allowed or absorbed by the seller to all destinations in the United States. This the Commission calls a zone delivered price system, the entire United States being the zone. The petitioners prefer to call the system "the universal delivered price method." All that this means is that tire chains, like chewing gum, cigarettes, and many other products, are sold everywhere at the same delivered prices, regardless of point of origin.
 
 
 20
 The Commission, in substance, found that the petitioners entered into agreements and understandings concerning current and future prices; that they cooperatively compiled schedules of common pricing factors used in selling welded chain; that they adopted and used, by agreement, the prices and discounts published by the American Chain & Cable Company, Inc., the largest manufacturer of chain in the United States; that they exchanged information as to prices at which their products were offered for sale generally and as to prices made particular customers; and that they promoted adherence to prices agreed upon through the Chain Institute and otherwise.
 
 The Commission further found that
 
 21
 "Each of the * * * manufacturers has quoted and sold chain and chain products at prices calculated pursuant to and in accordance with the particular method or system of computing delivered prices applicable to the products it sold, with the knowledge that all the other * * * manufacturers selling the same products were simultaneously doing likewise. In entering into and engaging in the cooperative and collective actions described hereinabove, there was necessarily an understanding and agreement between all of the respondents [before the Commission] that each of the * * * manufacturers would continue to use the particular method or system applicable to the type or types of chain each sold."
 
 The Commission also found:
 
 22
 "* * * All users of each of the three methods or systems of computing delivered prices have thus been enabled to present to a prospective purchaser a condition of matched prices in which such purchaser was isolated and deprived of any choice on the basis of price. The delivered costs to purchasers have not reflected any of the differences in cost of raw materials, other items, or freight delivery from the places of manufacture to the purchaser's delivery points. The principles and forces of competition have been prevented from making and determining the prices of each of the * * * manufacturers."
 
 
 23
 One not learned in unfair trade practices and unfair methods of competition might, from the record in this case, get the impression that the Commission's findings presented a somewhat overdrawn and unduly sinister picture of the situation out of which this controversy arose. We think, however, that there was a sufficient evidentiary basis for an inference by the Commission that the substantial uniformity and virtual identity of prices which existed in the chain industry resulted from concerted conscious action on the part of petitioners, amounting to conspiracy, and that the delivered pricing methods used by petitioners in connection with and in furtherance of their cooperative and collusive efforts to fix or stabilize prices for chain were necessarily an inherent and indispensable part of the conspiracy.
 
 
 24
 In the Cement Institute case it was asserted, as it is here, that the Commission failed to find, and that the evidence failed to show, any agreement to use the delivered price system involved in that case. See page 709 of 333 U.S., page 807 of 68 S.Ct. This contention was rejected by the Supreme Court.
 
 
 25
 The contention of petitioners that subparagraph (6) of the first ordering paragraph is invalid and unjustified by the evidence, cannot be sustained. The Supreme Court held in the Cement Institute case that a similar paragraph was valid. The Court said (page 729 of 333 U.S., page 817 of 68 S.Ct.): "The paragraph is merely designed to forbid respondents from acting in harmony to bring about national uniformity in whatever fashion they may seek by collective action to achieve that result."
 
 
 26
 It is evident that it is the third ordering paragraph by which the petitioners are most aggrieved and which they seem to construe as totally and permanently disabling each of them from selling its chain products at delivered prices, and leaving them no alternative but to sell at prices f. o. b. their respective factories. They say this will prevent them from engaging in country-wide competition and confine each of them to its own local trade territory. If this paragraph of the order of the Commission were to be given the effect of depriving each of the petitioners of every lawful and practical method of independently and honestly selling its products at delivered prices, and thus preventing it from engaging in nationwide competition, we would consider the paragraph invalid.
 
 
 27
 The only distinction between the third ordering paragraph in this case and the corresponding paragraph in the National Lead Co. case is that there the order proscribed the use of the zone delivered price system, which was the only delivered price system in question in that case, while in this case the Commission was dealing with three delivered price systems, each of which was used in computing the price of a single type of chain. In its supplemental brief, the Commission says:
 
 
 28
 "While the use of each system was limited in the past to a particular type of chain, each has been equally effective in restraining trade and eliminating competition. The order, we think, properly guarded against the use of the simple device of interchanging the systems used as among the three types of chain, and thus perpetuating the restraints of trade at which the order is directed. The Commission has frequently issued orders which have consistently been upheld by the Courts, prohibiting unfair methods and practices as to all products sold in cases where the methods and practices had been used in the past only in connection with the sale of one of the products."
 
 
 29
 It is possible that the Commission has made its order too broad in undertaking to proscribe the qualified independent use by each of the petitioners of the only practical systems of delivered pricing for its chain products. If in the National Lead Co. case the Commission had prohibited not only the individual use of the single delivered price system there involved, but had also conditionally prohibited the use of all other practical delivered price systems, the Supreme Court might have refused to sustain so broad a prohibition.
 
 
 30
 In Federal Trade Commission v. Ruberoid Co., supra, at page 473 of 343 U.S., at page 803 of 72 S.Ct., the Supreme Court, in sustaining an order of the Commission, said:
 
 
 31
 "* * * Orders of the Federal Trade Commission are not intended to impose criminal punishment or exact compensatory damages for past acts, but to prevent illegal practices in the future. In carrying out this function the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity. Moreover, `the Commission has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices' disclosed. Jacob Siegel Co. v. Federal Trade Comm., 1946, 327 U.S. 608, 611, 66 S.Ct. 758, 759, 90 L.Ed. 888. Congress placed the primary responsibility for fashioning such orders upon the Commission, and Congress expected the Commission to exercise a special competence in formulating remedies to deal with problems in the general sphere of competitive practices. Therefore we have said that `the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.' Id., 327 U.S. at page 613, 66 S.Ct. at page 760."
 
 
 32
 We gather from this and the other recent Supreme Court decisions to which reference has been made, that, unless an order of the Commission can be said to be purely arbitrary because without adequate evidentiary support or because clearly beyond the Commission's powers, it may not be set aside. The question of the adequacy of the evidentiary basis for the third ordering paragraph as applied to all types of chains and to every petitioner, whether it had used all of the three delivered price systems or not, is, to say the least, debatable. But if the Commission honestly and justifiably believed that competition in the chain industry had been virtually destroyed by the conduct of petitioners and that the third ordering paragraph was necessary to restore competitive prices, we cannot say that the Commission's determination in that regard was purely arbitrary. The Commission, in cases such as this, is the trier of the facts, the appraiser of the credibility of witnesses, the weigher of evidence, the drawer of inferences, and, within broad limits, the prescriber of remedies for trade practices found by it to be unfair. Its determination as to the facts is as invulnerable to attack as is a jury verdict in a case triable by and properly submitted to a jury. It seems apparent that, unless a reviewing court can demonstrate that the Commission's order is legally or factually baseless, it may not be set aside.
 
 
 33
 The scope of the third ordering paragraph in the instant case is, of course, the same as was the scope of the corresponding paragraph in the National Lead Co. case, with respect to which the Supreme Court said, page 431 of 352 U.S., at page 510 of 77 S.Ct.:
 
 
 34
 "* * * It is our conclusion that the order was not intended to and does not prohibit or interfere with independent delivered zone pricing per se. Nor does it prohibit the practice of the absorption of actual freight as such in order to foster competition. Furthermore, as we have said, there is read into the order the provision of § 2(b) of the Clayton Act as to the right of a seller in good faith to meet the lower price of a competitor. This is not to say that a seller may plead this section in defense of the use of an entire pricing system. The section is designed to protect competitors in individual transactions."
 
 
 35
 Moreover, the Commission does not place the same construction on the paragraph as do the petitioners. In its supplemental brief the Commission says:
 
 
 36
 "The order here does not require f. o. b. mill selling. As the Supreme Court pointed out in National Lead, `delivered zone pricing violates the order only when two conditions are present: (1) identical prices with competitors (2) resulting from zone delivered pricing' (352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d at page 443). So, here the order will be violated only if there are identical prices resulting from single basing point, freight equalization or zone delivered pricing. As we pointed out in our main brief, the order does not prohibit per se the use of any delivered price-system and can be fully complied with by competition in base prices, no matter what system of delivered pricing is used. If there is competition in base prices there cannot possibly be any `systematic matching' of delivered prices."
 
 
 37
 Furthermore, if conditions have changed and the third ordering paragraph is no longer needed to restore competition to the chain industry, it seems fair to assume that the Commission will, upon application, reopen the proceeding under Section 5(b) of the Federal Trade Commission Act as amended, and modify its order. See American Chain & Cable Co., Inc., v. Federal Trade Commission, 4 Cir., 142 F.2d 909, 911-912.
 
 
 38
 Columbus McKinnon Chain Corporation in its brief asserts that an adequate evidentiary basis for the Commission's finding that the company was involved in the conspiracy is lacking. The company points to the fact that it made no weldless chain, although it at times purchased small amounts of such chain for resale as an accommodation to its customers; that such resales were usually priced f. o. b. its factory at Tonawanda, New York, and rarely, when shipped with other chain, f. o. b. Pittsburgh; that about 95% of the tire chain sold by the company was its own patented "claw chain", the published price of which differed from the prices of tire chain of other petitioners; that, while in selling its patented tire chain it independently adopted the universal delivered price method, the use of that method did not result in "any regular identity of price with" the tire chain of other petitioners; that when the company entered the tire chain business it adopted the pricing practices of established manufacturers; and that the only way to compete for tire chain sales was by the universal price method, "Because of the homogeneity of the product and the peculiarly sporadic geography of the tire chain market."
 
 
 39
 Columbus McKinnon asserts that the Commission's inference of its complicity is based on: (1) its membership in the Chain Institute, and (2) the similarity of its prices on welded chain to those of competing manufacturers. It contends that, considered in proper perspective, those facts do not justify the inference, and that mere membership in a trade association, without more, is not enough to establish participation in a conspiracy. It cites, in that connection, Phelps Dodge Refining Corp. v. Federal Trade Commission, 2 Cir., 139 F.2d 393, 396. We note that in that case the court went on to say:
 
 
 40
 "* * * Thus the issue is reduced to whether a member who knows or should know that his association is engaged in an unlawful enterprise and continues his membership without protest may be charged with complicity as a confederate. We believe he may. Granted that his mere membership does not authorize unlawful conduct by the association, once he is chargeable with knowledge that his fellows are acting unlawfully his failure to dissociate himself from them is a ratification of what they are doing. He becomes one of the principals in the enterprise and cannot disclaim joint responsibility for the illegal uses to which the association is put. While the culpable role of petitioner Cyanamid is less clearly established than that of the three petitioners already considered, it nevertheless sustains the Commission's findings."
 
 
 41
 The record shows that the Columbus McKinnon Chain Corporation was an active member of the Chain Institute from its inception, and followed the delivered pricing methods of other petitioners at least with respect to unpatented tire chain and welded chain.
 
 
 42
 The Commission, we think, reasonably could infer that Columbus McKinnon Chain Corporation, as a member of the Chain Institute, knew or was charged with knowledge of the collusive efforts of other members to stabilize prices for chain and chain products by suppressing competitive pricing, and was therefore a party to the conspiracy. Compare, Federal Trade Commission v. Cement Institute, supra, pages 717-720 of 333 U.S., pages 811-812 of 68 S.Ct.
 
 
 43
 The order under review is affirmed, and an order of enforcement may be entered.
 
 
 
 Notes:
 
 
 [1]
 The proceeding before the Commission is entitled, In the Matter of Chain Institute, Inc., et al., Docket No. 4878, 49 F.T.C. 1041
 
 
 [2]
 38 Stat. 719, as amended, 52 Stat. 111, 15 U.S.C.A. § 45
 
 
 [3]
 38 Stat. 730, 49 Stat. 1526, 15 U.S.C.A. § 13