# FEDERAL TRADE COMMISSION *v.* NATIONAL LEAD CO. ET AL.

No. 63.   Argued December 12, 1956.—Decided February 25, 1957.

*Earl W. Kintner* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Hansen, Charles H. Weston* and *Robert B. Dawkins.*

*Eugene Z. Du Bose* argued the cause for respondents. On the brief were *Mr. Du Bose* for the National Lead Co., *Thomas J. McDowell* for the Sherwin-Williams Co., and *Nathan S. Blumberg* for the Eagle-Picher Co. et al., respondents. Also on the brief were *John B. Henrich, Jr., Richard Serviss, Robert A. Sturges* and *John T. Van Keuls* of counsel.

MR. JUSTICE CLARK delivered the opinion of the Court.

The sole question involved in this proceeding under § 5 of the Federal Trade Commission Act [1] concerns the power of the Commission in framing an order pursuant to its finding that respondents had conspired to adopt and use a zone delivered pricing system in their sale of lead pigments.[2] In its general cease and desist order prohibiting concert of action among respondents in the further use

---

[1] 38 Stat. 719, as amended, 15 U. S. C. § 45.

[2] The three principal lead pigments are dry white lead, white lead in oil, and the lead oxides, red lead and litharge. Dry white lead is a fine white powder used as a pigment in paints. White lead in oil is white lead with linseed oil added and is sold for use as the basic ingredient in exterior house paint. Lead oxides and litharge are sold to electric storage battery manufacturers as the basic raw material for battery plates. Red lead is also the basic ingredient in red lead paint commonly used as a protective coating for iron and steel structures.

of such system, the Commission inserted a provision directing each respondent individually to cease and desist from adopting the same or a similar system of pricing for the purpose or with the effect of "matching" the prices of competitors. The respondents assert that this is beyond the power of the Commission, and the Court of Appeals agreed, 227 F. 2d 825, striking that provision from the Commission's order. We granted certiorari, 351 U. S. 961, because of the importance of the question in the administration of the Act. We restore the stricken provision of the Commission order, permitting it to stand with the interpretations placed upon it in this opinion.

## I.

The original proceeding under § 5 of the Act was commenced in 1944. The order was entered on a second amended complaint filed in 1946. After protracted hearings, the Commission entered its findings which the Court of Appeals has held to be supported by substantial evidence. The findings material here are as follows:

The pricing practice of the industry as to the sale of white lead in oil prior to 1933 is not shown in the record. However, National Lead had as early as 1910 sold this pigment on the basis of territorial differentials involving free freight to specified towns. The differentials added to the base price were generally uniform for some 589 cities listed in National Lead's pricing system in 1933. The charge to purchasers outside the listed cities was the base price plus actual freight to the nearest listed city. In the sales of dry white lead and lead oxides it appears that by the sales practice prior to 1933 there was a uniform delivered price in the case of the white lead, while the purchasers of lead oxides paid the freight charge in addition to the base price.

Beginning in July 1933, the industry held a series of meetings in Chicago for the ostensible purpose of draft-

ing a code of fair competition to govern it under the National Industrial Recovery Act. These meetings resulted in an understanding and agreement among those attending, including respondents, to sell lead pigments "on the basis of flat delivered prices to customers within designated zones, with uniform differentials applicable as between such zones . . . ." 49 F. T. C. 840. Four zoning systems were established covering the various lead pigments. As an example, the system for white lead in oil and "keg" products consisted of 12 geographical zones, one known as a par zone. The remaining zones in this system were known as premium zones, the price in each being determined by adding a set premium to the par zone price. These premiums varied from $.125 per cwt. in two of the zones to a high of $1 per cwt. in the premium zone covering the State of New Mexico.[3] The zones were highly artificial and zone boundaries led to bizarre results at times, with purchasers located near the plants of respondents being charged higher prices than those located at a distance from the plants. The industry, including respondents, not only agreed to sell at the same zone delivered prices in identical geographical zones but also adopted uniform discounts, terms of sale, and differentials with respect to certain of their products. A further agreement was to sell white lead in oil on the basis of consignment contracts.

The Commission stated that "nowhere in the code, nor in any preliminary draft of a code produced at the meetings of any of the committees, is there any reference to

[3] The par zone includes a number of northeastern and midwestern States. However, some cities located within these States are excluded from the par zone. On the other hand, the San Francisco area is a par zone, as is the City of St. Louis, though both are located in States not included in par zone areas. For a detailed discussion and maps of the operation of the zone pricing system, see the findings, 49 F. T. C. 840–870.

the use of zones or to territorial differences in the prices of lead pigments, or to the use of agency or consignment contracts or arrangements in the sale of white lead-in-oil." *Id.*, at 839. The Commission added that "with certain exceptions, the respondents have followed the pricing practices and have adhered to the terms and conditions for the sale of lead pigments agreed upon in 1933 and 1934 as herein found from 1934 to the present time." *Id.*, at 849. The respondents admit that they are bound by these findings and we see no reason to disturb them.

## II.

The Commission entered an order prohibiting respondents from entering into or carrying out any "planned common course of action," agreement, or conspiracy to sell at prices determined pursuant to a "zone delivered price system," or any other system resulting in identical prices at the points of sale. The order also included a provision, to which respondents strenuously object, directing each of them to cease and desist from

> "quoting or selling lead pigments at prices calculated or determined in whole or in part pursuant to or in accordance with a zone delivered price system for the purpose or with the effect of systematically matching the delivered price quotations or the delivered prices of other sellers of lead pigments and thereby preventing purchasers from finding any advantage in price in dealing with one or more sellers as against another." *Id.*, at 873–874.

The Commission, in an accompanying opinion, stated that in all cases where it found violations of the law, "it is the Commission's duty to determine to the best of its ability the remedy necessary to suppress such activity and to take every precaution to preclude its revival." *Id.*, at 884. In this case, the opinion pointed out, the

respondents cooperatively revised the pricing practices in the industry by establishing a "uniform zone pricing system." Detailed discussions were carried on which resulted not only in an agreement, but "maps showing the boundaries of the zones to be observed . . . were distributed" by the individual respondents. *Id.*, at 884. Each respondent has "since that time . . . followed the pricing system and adhered to the zone boundaries so discussed and shown on these maps." *Ibid.* Discussing the complaint, the Commission in its opinion further noted that charges were included against each respondent as to its individual use of and adherence to the zone system of selling " 'for the purpose and with the effect of enabling the respondents to match exactly their offers to sell lead pigments to any prospective purchaser at any destination, thereby eliminating competition between and among themselves.' . . . It was the adherence by each of them to this system of pricing that made the combination work. . . . Unless and until each of the respondents is prohibited from so adhering to the system and from so using the zones, the evils springing from the combination, one of which is to eliminate price competition, may well continue indefinitely. Unless the respondents, representing practically the entire economic power in the industry, are deprived of the device which made their combination effective, an order merely prohibiting the combination may well be a useless gesture." *Id.*, at 884–885. In its view, the Commission added, the "prohibition is necessary, not because it is unlawful in all circumstances for an individual seller, acting independently, to sell its products on a delivered price basis in specified territories, but to make the order fully effective against the trade restraining conspiracy in which each of the respondents [defendants] participated." *Id.*, at 884. When and if competition is restored and the indi-

vidual prohibition is no longer necessary, the Commission expressed its intention, upon application, to vacate the latter provision of its order.

## III.

At the beginning we must understand the limits of the contested portion of the order. *First,* it is temporary. Though its life expectancy is not definite, it is clear that the Commission was creating a breathing spell during which independent pricing might be established without the hang-over of the long-existing pattern of collusion. *Second,* the order is directed solely at the use of a zone delivered pricing system [4] and no other. This system is a pricing method based on geographic divisions or zones, the boundaries of which are entirely drawn by the seller. His delivered price is the same throughout a particular geographic zone so drawn up by him. Customarily the delivered price is different between zones, though as here, widely separated zones, geographically, might have the same delivered price. It is well to mention here that while this Court has passed upon the validity of basing point systems of sales, *Corn Products Refining Co.* v. *Federal Trade Commission,* 324 U. S. 726 (1945), it has not decided the validity of the zone pricing plan used here. *Third,* zone delivered pricing *per se* is not banned by the order. The Commission might have made the order more specific by entering a flat prohibition of the use for a definite period of the device found to be "the very cornerstone of the . . . conspiracy," *i. e.,* zone pricing. See *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 428 (1945), where the corporate defendants were enjoined from "forming or joining any such trade association" for

---

[4] Our discussion of the zone delivered pricing system should in no way be construed as our approval of its use. We do not reach that question.

a period of five years. But the Commission chose the more flexible sanction, *i. e.,* the limited use of zone delivered pricing. However, it concluded that the future use should be temporarily restricted for the protection of the public. And so, delivered zone pricing violates the order only when two conditions are present: (1) identical prices with competitors (2) resulting from zone delivered pricing. Considering these conditions with the mechanics of the zone plan, we see that the only way prices can be systematically identical is for the zones of competitors to be so drawn as to be in whole or in part identical and for zone prices to be the same in those zones which coincide or overlap.[5]

Respondents contend that the cease and desist order, as written, excludes the benefits of § 2 (b) of the Clayton Act.[6] While § 2 (b) "does not concern itself with pricing systems . . . [but] only [with] the seller's 'lower' price and [with] that only to the extent that it is made 'in good faith to meet an equally low price of a competitor,'" *Federal Trade Commission* v. *A. E. Staley Mfg. Co.,* 324 U. S. 746, 753 (1945), this section is read into every Commission order. *Federal Trade Commission* v. *Ruberoid Co.,* 343 U. S. 470, 476 (1952). Since § 2 (b) must, therefore, be read into this order, the respondents are afforded all of the benefits of that section.

## IV.

It is the contention of respondents that the contested paragraph of the order effectively bans the noncollusive,

---

[5] At oral argument, counsel for the Federal Trade Commission was requested by the Court to submit a statement on behalf of the Commission setting forth its view as to the scope of the disputed paragraph of the cease and desist order. In response, the Commission supplied its interpretation which coincides with that set out here.

[6] 49 Stat. 1526, 15 U. S. C. § 13 (b).

individual use of zone pricing, a lawful, competitive sales method, and is therefore beyond the authority of the Commission. Respondents further assert that even if the Commission had such authority its exercise here was entirely improper, unnecessary, and would, in fact, hamper competition in the industry. They stress that the complaint did not include a charge that the individual use of zone pricing was unlawful; that it came into the case after the Trial Examiner had filed his recommended decision and order; and that respondents were denied the opportunity of rebutting the charge by evidence showing zone pricing to be "a logical, economical, and competitive method of doing business." The insertion of the objectionable paragraph, they contend, violates due process in that they had no opportunity to defend. Since § 2 (b) is read into every Commission order and since it would allow respondents to rebut the charge, their contention is completely answered and we shall not deal with it further.

It goes without saying that the requirements of a fair hearing include notice of the claims of the opposing party and an opportunity to meet them. *Morgan* v. *United States,* 304 U. S. 1 (1938). The record indicates that the respondents were afforded those safeguards. The emphasis that there was no charge, no evidence, no finding to support the inclusion of the objectionable provision in the order is misplaced. Its insertion was nothing more than a mode of implementation, selected by the Commission, to enforce its findings of violations of the Act. Moreover, the record is replete with evidence that counsel supporting the complaint would seek the use of such a method of enforcement. As far back as in early 1947, while the case was before the Examiner, the issue concerning the effect of the zone pricing system used by respondents was before the Commission on motions to dismiss. Admittedly Count II of the complaint dealt with the use of the zone system itself. The Commission overruled the

motions to dismiss, adopting the view of counsel support-
ing the complaint that its allegations were directed
against the effects of the alleged system or method, *i. e.,*
the zone pricing plan, and "not against individual in-
stances" of discrimination in pricing. Furthermore, in
May 1948, almost five years before the decree was entered,
counsel supporting the complaint filed written exceptions
to the recommended decision of the Examiner on the
ground, among others, that it did not include a provision
similar to the one objected to here. If respondents
thought rebuttal evidence necessary, the record is bare
of any effort on their part to offer it. Nor was any re-
quest made to reopen the case for that purpose after it
reached the Commission.

We pass on to respondents' major contention question-
ing the power of the Commission. As the Court has said
many times before, the Commission may exercise only the
powers granted it by the Act. *Federal Trade Commis-
sion* v. *Western Meat Co.,* 272 U. S. 554, 559 (1926).
The relevant sections empower the Commission to pre-
vent the use of unfair methods of competition and
authorize it, after finding an unfair method present, to
enter an order requiring the offender "to cease and desist"
from using such unfair method.

The Court has held that the Commission is clothed
with wide discretion in determining the type of order
that is necessary to bring an end to the unfair practices
found to exist. In *Jacob Siegel Co.* v. *Federal Trade
Commission,* 327 U. S. 608 (1946), the Court named the
Commission "the expert body to determine what rem-
edy is necessary to eliminate the unfair or deceptive
trade practices which have been disclosed. It has wide
latitude for judgment and the courts will not interfere
except where the remedy selected has no reasonable rela-
tion to the unlawful practices found to exist." *Id.,* at
612–613. Thereafter, in *Federal Trade Commission* v.

*Cement Institute*, 333 U. S. 683, 726 (1948), the Court pointed out that the Congress, in passing the Act, "felt that courts needed the assistance of men trained to combat monopolistic practices in the framing of judicial decrees in antitrust litigation." In the light of this, the Court reasoned, it should not "lightly modify" the orders of the Commission. Again, in *Federal Trade Commission* v. *Ruberoid Co., supra,* at 473, we said that "if the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." We pointed out there that Congress had placed the primary responsibility for fashioning orders upon the Commission. These cases narrow the issue to the question: Does the remedy selected have a "reasonable relation to the unlawful practices found to exist"? We believe that it does. First, the simplicity of operation of the plan lends itself to unlawful manipulation; second, it had been used in the industry for almost a quarter of a century; and, third, its originator and chief beneficiary had been previously adjudged a violator of the antitrust laws. *United States* v. *National Lead Co.,* 332 U. S. 319 (1947).

The respondents were found to have plainly disregarded the law. In this respect the Commission correctly considered the circumstances under which the illegal acts occurred. Those in utter disregard of law, as here, "call for repression by sterner measures than where the steps could reasonably have been thought permissible." *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 89–90 (1950). Respondents made no appeal here from some of the findings as to their guilt. Having lost the battle on the facts, they hope to win the war on the type of decree. They fight for the right to continue to use

individually the very same weapon with which they carried on their unlawful enterprise. The Commission concluded that this must not be permitted. It was "not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than [it] requires . . . ." *International Salt Co.* v. *United States,* 332 U. S. 392, 400 (1947). Although the zone plan might be used for some lawful purposes, decrees often suppress a lawful device when it is used to carry out an unlawful purpose. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436 (1940); *United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707 (1944). In such instances the Court is obliged not only to suppress the unlawful practice but to take such reasonable action as is calculated to preclude the revival of the illegal practices. *Ethyl Gasoline Corp.* v. *United States, supra,* at 461; *Local 167, I. B. T.* v. *United States,* 291 U. S. 293 (1934). See also *United States* v. *United States Gypsum Co., supra; United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 188 (1944).[7] We therefore conclude that, under the circumstances here, the Commission was justified in its determination that it was necessary to include some restraint in its order against the individual corporations in order to prevent a continuance of the unfair competitive practices found to exist. *Federal Trade Commission* v. *Standard Education Society,* 302 U. S. 112, 120 (1937). We shall now examine the restraint imposed.

Respondents point out that in only one other case in the long history of the Commission has a similar order

---

[7] We need not discuss the full scope of the powers of the Federal Trade Commission, nor their relative breadth in comparison with those of a court of equity. As this Court said in *May Dept. Stores Co.* v. *Labor Board,* 326 U. S. 376, 390 (1945), "The test . . . is whether the Board might have reasonably concluded . . . that such an order was necessary . . . ."

been entered. They say our restoration of the contested paragraph will effectively prevent competition. In its supplemental memorandum, see note 5, *supra,* the Commission has clearly stated its understanding of the scope and effect of the order. It is our conclusion that the order was not intended to and does not prohibit or interfere with independent delivered zone pricing *per se.* Nor does it prohibit the practice of the absorption of actual freight as such in order to foster competition. Furthermore, as we have said, there is read into the order the provision of § 2 (b) of the Clayton Act as to the right of a seller in good faith to meet the lower price of a competitor. This is not to say that a seller may plead this section in defense of the use of an entire pricing system. The section is designed to protect competitors in individual transactions.

Respondents pose hypothetical situations which they say may rise up to plague them. However, "we think it would not be good judicial administration," as our late Brother Jackson said in *International Salt Co.* v. *United States,* 332 U. S. 392, 401 (1947), to strike the contested paragraph of the order to meet such conjectures. The Commission has reserved jurisdiction to meet just such contingencies. As actual situations arise they can be presented to the Commission in evidentiary form rather than as fantasies. And, we might add, if there is a burden that cannot be made lighter after application to the Commission, then respondents must remember that those caught violating the Act must expect some fencing in. *United States* v. *Crescent Amusement Co., supra,* at 187.

*Reversed.*