**STOKELY–VAN CAMP, Inc., et al.,**[1] **Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 11863.

United States Court of Appeals Seventh Circuit.

July 17, 1957.

[1.] H. J. Heinz Company, Campbell Soup Company, Joseph Campbell Company, Bauer Cannery, Inc., Foster Canning, Inc., Hirzel Canning Company, Lake Erie Canning Co. of Sandusky, J. Weller Company, and Winorr Canning Company.

Thomas M. Scanlon, Indianapolis, Ind., Thomas F. Butler, Jr., Toledo, Ohio, Paul M. Duff, Pittsburgh, Pa., Henry N. Ess, III, New York City, Charles E. Kenworthey, Pittsburgh, Pa., G. Lincoln Lewis, Indianapolis, Ind., Walter T. McGough, Pittsburgh, Pa., Donald F. Melhorn, Toledo, Ohio, and Henry Pollard, New York City, for petitioner.

Robert B. Dawkins, Asst. Gen. Counsel, J. B. Truly, Atty., Earl W. Kintner, Gen. Counsel, Gerald Harwood, Atty., Federal Trade Commission, Washington, D. C., for respondent.

Before LINDLEY and SCHNACK-ENBERG, Circuit Judges, and BRIGGLE, District Judge.

SCHNACKENBERG, Circuit Judge.

On the petition of Stokely-Van Camp, Inc., et al., we review an order of the Federal Trade Commission directing petitioners to cease and desist from engaging in certain acts and practices found to constitute unfair methods of competition and unfair acts or practices in commerce, within the meaning of section 5 of the Federal Trade Commission Act, as amended.[2] The hearing exam-

2. The pertinent provisions of the Act are as follows:

"Sec. 5. (a) (1) Unfair methods of competition in commerce, and unfair or

iner and the Commission found that petitioners, in purchasing raw tomatoes in 1951 for canning purposes, had violated the Act by entering into a ccmmon understanding and agreement to refuse to negotiate or deal with Cannery Growers, Inc., a tomato growers co-operative marketing association (referred to herein as "co-op"), or to recognize it as the bargaining agent for its grower members.

The Commission's complaint was issued on May 21, 1952. Petitioners' answers denied that they had violated the Act.

The hearing examiner issued two initial decisions in this case. The first was rendered on February 3, 1954, at the conclusion of the introduction of evidence in support of the complaint.[3]

The second initial decision, rendered on August 8, 1955, at the close of the entire case, dismissed all the allegations of the complaint charging petitioners herein with inducing the grower members to breach their contracts with the co-op. As to petitioners and Hunt Foods of Ohio, Inc., the hearing examiner made findings of fact, and concluded, that their acts and practices, beginning in the spring of 1951 and continuing through the remainder of the tomato contracting and harvesting season of that year, were performed pursuant to a common understanding and planned common course of action (a) to refuse to negotiate or deal with the co-op as a bargaining agent for its grower members, and (b) to refuse to grant recognition of, or to negotiate with, the co-op by deducting the dues check-off for

grower members of that organization, which constitutes an unreasonable restraint of trade and an unfair method of competition under the Act. However, he dismissed the complaint without prejudice, saying, that "it is believed that the Commission would be justified in assuming from the facts disclosed that the respondents will not again attempt to engage in these acts and practices in this industry and therefore it would not be in the public interest for the Commission to issue an order to cease and desist at this time".

The Commission, on appeal from the second initial decision, held that the record fully supported the hearing examiner's findings as to the existence in 1951 of an agreement to boycott the co-op. But it held that it would not be justified in assuming that the boycott would not be renewed, and that the public interest required the prevention of such renewal by issuing an order. On June 29, 1956, such an order was issued, directing that petitioners cease and desist from entering into, continuing, co-operating in, or carrying out any planned course of action, understanding, agreement, combination or conspiracy, to do or perform any of the following acts or things:

(a) Refusing to grant recognition of or to negotiate or deal with Cannery Growers, Inc., an association of tomato growers, as a bargaining agent for its grower members;

(b) Refusing to purchase or to contract to purchase tomatoes from growers who are members of Cannery Growers, Inc.[4]

deceptive acts or practices in commerce, are hereby declared unlawful. * * * "(6) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 66 Stat. €32, 15 U.S.C.A. § 45(a) (1) (6).

3. Upon motion of respondents, the examiner dismissed the complaint as to certain respondents for failure of proof, and dismissed as to all respondents the allega-

tions of the complaint relating to price fixing and preventing competing purchasers from dealing with the co-op. An appeal was taken to the Commission only with respect to the dismissal of the price fixing charges, and the hearing examiner's decision was affirmed.

4. The position of the petitioners in this court, in reference to clause (b) is not clear. Moreover this clause is practically ignored in the Commission's brief and is not involved in the contested issue stated in petitioners' brief, except that

1. Briefly, petitioners state their position as follows: There was no direct evidence of a conspiracy, and hence this is an inference case. In 1951 the co-op arbitrarily asserted that a refusal to agree to its demands constituted a refusal to negotiate and a refusal to grant a dues check-off constituted a refusal to recognize. The attitude of the various petitioners toward the co-op varied; two for independent business reasons did not negotiate; some negotiated briefly but gave up because of the unreasonable demands of the co-op; others continued to negotiate and came close to agreement. The only similarity of conduct among petitioners was inability to reach agreement with the co-op. This evidence cannot support a finding of a common course of conduct to refuse to negotiate. They further contend that the Commission ignored the obvious fact that the conduct of petitioners toward the co-op was reasonable and the exercise of good business judgment, and that the co-op injected itself into a well-established economic relationship and attempted to effect drastic changes in price and other terms, all within the short space of the few weeks of the tomato contracting season. They point out that the co-op had never negotiated before, lacked confidence in its own position, wrote threatening letters and took extravagant positions in negotiation from which it did not retreat until the end of the tomato contracting season when it was too late to get tomato plants into the ground. It demanded a price increase of 65%, elimination of quality controls, a check-off of dues to it and by bulletins to its members engaged in a campaign of abuse. Petitioners did not know how many growers belonged to the co-op, questioned its responsibility, had no permission from its growers to grant the check-off and could not economically pay the 65% increase in price demanded by the co-op. Petition-

ers and the co-op failed to agree upon a contract during the relatively short tomato contracting season because of these economic and psychological reasons, leaving no legal basis for the inference that such failure was the result of conspiracy.

On the other hand, respondent's contentions may be summarized as follows: The meetings between the parties do no in themselves constitute negotiations, and petitioners in reality were attempting to obtain approval of their standard forms of contract without negotiation, and at the same time were refusing to recognize the co-op as the bargaining agent of its members. Respondent asserts that the co-op made no adamant demands on the processors and petitioners' alleged business reasons for not negotiating or dealing with the co-op do not render lawful a conspiracy to boycott the co-op.

■ In their brief petitioners concede that a common agreement to refuse to negotiate with or recognize the co-op would obviously have constituted illegal conduct under the Act.

■■ The record before us is massive. It contains 4463 pages of proceedings and 282 pages of exhibits. There is substantial evidence in the whole record to support the Commission's findings of fact, and showing the existence of such an agreement. Those findings are therefore conclusive. Allied Paper Mills v. Federal Trade Commission, 7 Cir., 168 F.2d 600, 605, certiorari denied 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081. This is also true as to inferences which reasonably can be drawn from the proven facts. Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, at page 61, 47 S.Ct. 255, 71 L.Ed. 534; Triangle Conduit & Cable Co. v. Federal Trade Commission, 7 Cir., 168 F.2d 175, 180, affirmed sub nom. Clayton Mark & Co. v. Federal Trade

they allege that a charge that petitioners engaged in a common course of action to boycott grower members of the co-op was among eight dismissed charges. On the other hand respondent, while denying that

this charge was dismissed, cites no finding of fact incorporated in the Commission's order under review either expressly or by reference to the initial decision, upon which clause (b) may be based.

Commission, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110, and National Lead Company v. Federal Trade Commission, 7 Cir., 227 F.2d 825, 833, reversed on other grounds 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438. We hold that on the record as a whole there is substantial evidence to support the Commission's findings. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

2. With the complaint issued by the Commission, respondents named therein (including petitioners here) were given notice that they had a right to appear and show cause why an order should not be entered requiring them to cease and desist from the violations of law charged in the complaint. Such is the character of the order from which the present appeal has been taken.

The Commission contends that, in the exercise of its discretion, it properly concluded that the public interest required an order to cease and desist. On the other hand, petitioners claim that the purpose of a cease and desist order is not to punish for past practices, but rather to insure that in the future the public will be protected, and that the public interest in the issuance of such an order requires that there be some reasonable expectation that the violations will be repeated. They cite our language in National Lead Co. v. Federal Trade Commission, supra, 227 F.2d at page 839,

"* * * While the Commission is vested with a broad discretion to determine whether an order is needed to prevent the resumption of unlawful acts which have been discontinued, this 'discretion must be confined * * * within the bounds of reasonableness.' [citing Marlene's Inc. v. F. T. C., 7 Cir., 216 F.2d 556, at page 559].

"This rule of reasonableness requires something more than a mere guess or suspicion contrary to the evidence and to the finding of the trial examiner that a resumption of

discontinued practices may not reasonably be anticipated. * * *"

They also quote the following from United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303:

"But the moving party [Commission] must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. * * *"

They refer to Eugene Dietzgen Co. v. Federal Trade Commission, 7 Cir., 142 F.2d 321, 331, where we said:

"The object of the proceeding is to *stop* the unfair practice. If the practice has been surely stopped and by the act of the party offending, the object of the proceedings having been attained, no order is necessary, nor should one be entered. * * *"

They also cite Federal Trade Commission v. Civil Service Training Bureau, Inc., 6 Cir., 79 F.2d 113, at page 116, involving a cease and desist order against misleading advertising practices, where, the court said:

"The commission is not authorized to issue a cease and desist order as to practices long discontinued, and as to which there is no reason to apprehend renewal."

Petitioners point to their conduct, both before and after the filing of the complaint herein, which, they say, clearly indicates that there is no reasonable expectation that they or any of them will, in the future, resort to any planned common course of action to boycott or refuse to recognize the co-op or negotiate with it.

Their argument we now summarize.

Whatever petitioners did with relation to the co-op in 1951 was born of the economic conflict which resulted from the appearance of a new and revolutionary force in the tomato industry in

Ohio. In late 1950 and early 1951 the co-op claimed representation of a large number of growers in the Ohio tomato market. The co-op proceeded, in a militant fashion, to make demands upon the Ohio processors. The record shows that the petitioners considered these demands unreasonable and as posing a serious threat to the economy of the entire industry. Despite this, the co-op remained firm in its demands throughout the normal tomato contracting season of 1951. The stalemate which resulted was purely temporary. By the latter part of May 1951 the co-op had negotiated a contract with Hunt, had actively negotiated with petitioner Stokely, and had discussed contract terms with most of the other petitioners. By the end of May it was too late in the season for any of the petitioners to do anything about advance contracting for the 1951 crop. If the period during which a compromise could have been achieved between the co-op and the processors had not been limited to the contracting season, other contracts with the co-op might well have resulted. In any event, the alleged conspiracy had terminated and the petitioners and other processors had come to recognize the co-op's position in the industry months prior to the issuance of the complaint on May 21, 1952. The hearing examiner concluded that the battle had ended and that the practices proscribed by the Act would not be resumed.

The hearing examiner held:

"* * * that the Commission would be justified in assuming from the facts disclosed that the respondents will not again attempt to engage in these acts and practices in this industry and therefore it would not be in the public interest for the Commission to issue an order to cease and desist at this time".

He mentioned several specific facts supporting his conclusion:

"(1) The acts and practices complained of had been definitely discontinued by respondents before the complaint in the case was issued.

"(2) The acts and practices complained of had not been committed for over four years.

"(3) The Co-op had acquired and now occupies a strong position in the industry as a bargaining agent for its member growers.

"(4) Early in 1952 all the respondent processors with the exception of Campbell freely negotiated with the Co-op, had their contracts approved and allowed the 1% check-off which had been the principal stumbling block to negotiations the previous year.

"(5) Commission counsel had not only conceded these facts in their proposed findings but, at the oral argument, also conceded that the alleged illegal practices would probably not recur."

Commission counsel proposed findings of fact to the hearing examiner, as follows:

"L. *The Situation Since 1951.*

"166. In 1952, the concerted, planned common course of action between and among the respondents was abandoned and many of them encountered no difficulty in recognizing and dealing with the Cooperative. The respondents, who adopted this more reasonable and wholesome approach included Heinz, Stokely, Hunt-Ohio, Bauer, Sharp, and Winorr, all of whom conferred with officials of the Cooperative, engaged in discussions concerning approval of their contracts, had their contracts approved, and deducted the check-off for the Cooperative.

"167. In 1952 many of the tomato processors had a more friendly attitude toward the Cooperative and were agreeable to granting audiences to its officials. Respondent Everitt E. Richard of respondent Heinz conferred and negotiated with officials of the Cooperative early in March 1952, two weeks before the Heinz contract prices were announc-

ed. Then when the Heinz prices were announced on March 14, 1952, the Cooperative approved such prices and the Heinz contract. Thereafter, Mr. Richard wrote a letter to the President of the Cooperative, enclosed a copy of the Heinz contract, and advised that Heinz would deduct the check-off and remit the same to the Cooperative for grower-members who authorized such deductions. Respondent A. A. Ehrman of respondent Stokely engaged in an earnest effort to negotiate and did negotiate with the Cooperative in 1952. Respondent Hunt-Ohio did likewise. Respondents Stokely and Hunt-Ohio also sent letters to the Cooperative in 1952, similar to the one sent by Heinz, confirming the results of the negotiations.

"168. Beginning in 1952 certain of the respondents realized the Cooperative was here to stay, that the growers had agreed to it and were agreeable to the check-off, and that the processors would have to conform with the growers' wishes. The respondents who started dealing with the Cooperative in 1952 have continued to do so, and have continued to deal and contract directly with their growers as they always did. Since 1951 there have been no difficulties, and contracts of many of the respondent processors have been approved and relations between them and the Cooperative have been amicable." [5]

These findings were adopted by the hearing examiner, who stated:

"In view of the definite discontinuance of the foregoing acts and practices by the respondent processors before the complaint in this case was issued, and the fact that they have not been committed for more than four years since, and the strong position that the Co-op now occupies in the industry as a bar-

gaining agent for its member tomato growers in the Ohio area, it is believed that the Commission would be justified in assuming from the facts disclosed that the respondents will not again attempt to engage in these acts and practices in this industry and therefore it would not be in the public interest for the Commission to issue an order to cease and desist at this time. * *."

The Commission adopted *in toto* the hearing examiner's findings. The only announced basis for its reversal of his conclusion that a cease and desist order would not be in the public interest is contained in a single paragraph. It follows:

"In the present case, it is clear that respondents did cease the practices complained of prior to the issuance of the complaint and have not renewed them. Nevertheless, they have at all times insisted that their course of conduct did not violate the law. No affidavits or statements appear in the record indicating a clear intention to refrain from the practices found to exist. The fact that the Co-op now occupies a strong position in the industry as a bargaining agent is a circumstance to be considered, but we do not consider it sufficient. No criticism is to be made against respondents for vigorously defending the position they had taken. This, of course, they had a right to do. Our conclusion simply is that the facts in this particular case do not warrant a dismissal without prejudice; on the other hand, we think an order based on the findings should be issued."

The Commission contends that its action was proper. It relies upon what we said in Marlene's Inc. v. Federal Trade Commission, 216 F.2d 556, 559:

"That discontinuance of an unlawful practice, of itself does not necessarily preclude the issuance of a cease and desist order is so well

---

5. The above excerpt omits references to the numbers of record pages and exhibits.

settled as to preclude further argument."

and

" * * * 'the Commission has broad discretion to determine whether such an order is needed to prevent resumption' of the unlawful practice."

We added the following language not quoted by the Commission:

" * * * This discretion must be confined, however, within the bounds of reasonableness."

Whether or not the discretion granted to the Commission is broad enough to sustain the cease and desist order in this case requires us to consider not only the facts appearing in the record, upon which the hearing examiner based his conclusion that the entry of a cease and desist order would not be in the public interest, but the facts stated by the Commission which it considered sufficient to justify such order.

If we consider only the hearing examiner's statement of the facts upon which his conclusion rested, and the actual findings of fact 166, 167 and 168, *supra*, which were adopted by the Commission, we see no reason for the issuance of a cease and desist order.

We must, however, consider the reasons given by the Commission for ruling otherwise. It alludes to only four *facts*. Incidentally, none of those facts is disputed in this case. They are (1) respondents did cease the practices complained of prior to the issuance of the complaint and have not renewed them, (2) they have at all times insisted that their course of conduct did not violate the law, (3) no affidavits or statements appear in the record indicating a clear intention to refrain from the practices found to exist, and (4) the co-op now occupies a strong position in the industry as a bargaining agent.

We are unable to see how fact (1) calls for a cease and desist order. Unless persuasive reasons to the contrary appear, this fact calls for a rejection of such an order.

Fact (2) is irrelevant. Its irrelevancy is emphasized by the Commission's apologetic statement that no criticism is to be made against respondents (petitioners here) for vigorously defending the position they had taken, which, of course, they had a right to do. It does not follow, however, that one who defends charges before the Commission is, on that account, to be subjected in the future to a cease and desist order because his defense there proves unsuccessful. That would be a policy abhorrent to our sense of justice.

As to fact (3), it may be admitted *arguendo* that no affidavits or statements appear in this record showing a clear intention by petitioners to refrain from the practices found to exist. However, there are no affidavits or statements to the contrary. The actual absence of such practices by petitioners, during a period of four years between the termination of the conspiracy in 1951 and the entry of the cease and desist order in 1956, weighs heavily in support of a conclusion that, after the tomato growing season of 1951 ended, there has been no intention on the part of petitioners to again engage in those practices.

As to fact (4), while recognizing the strong position of the co-op as a bargaining agent in the industry, the Commission lightly brushes that fact aside because it does "not consider it sufficient." Why, it does not explain. That statement, without any indication of facts to support it, expresses no adequate basis for a proper exercise of discretion. Dogmatically, the Commission then abruptly states that its conclusion "simply is that the facts in this particular case do not warrant a dismissal without prejudice; on the other hand, we think that an order based on the findings should be issued." Its language boils down to this: "It is so simply because we say it is so."

We think that the hearing examiner was right and that the Commission was wrong in entering the cease and desist order. It should have dismissed the complaint, without prejudice.

For the reasons above set forth, the order of the Commission is set aside and the case is remanded to the Commission with instructions to dismiss the complaint, without prejudice.

Order set aside and case remanded with instructions.