FEDERATED NATIONWIDE WHOLE-SALERS SERVICE, Garydean Corp., a corporation trading under the names Federated Wholesalers Service, Nationwide Wholesalers Service, and Federated Wholesalers Nationwide Service, Jay Norris Corp., a corporation, and Joel Jacobs and Mortimer Williams, individually and as officers of said corporations, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 306, Docket 31599.

United States Court of Appeals Second Circuit.

Argued April 22, 1968.

Decided July 8, 1968.

5(e). Cf. Mondy v. Crown Zellerbach Corp., 271 F.Supp. 258 (E.D.La.1967). Such a suit is not before us.

254

Solomon H. Friend, New York City (Bass & Friend, New York City, on the brief), for petitioners.

Louis Rosenman, F.T.C., Washington, D. C. (James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Alvin L. Berman, F.T.C., Washington, D. C., on the brief), for respondent.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge:

This is a petition to review a decision of the Federal Trade Commission in

which the petitioners, who sell items of general merchandise to consumers and retail stores through mail-order catalogs, were found to have engaged in unfair and deceptive trade practices by advertising their business as a wholesale operation and by offering goods for sale at what they termed wholesale prices. We hold that the findings of the Commission are supported by substantial evidence, and affirm its decision, but grant enforcement subject to certain modifications in its order.

In 1944 Textile Mart, Inc. (Textile) was organized to sell items of general merchandise, primarily to small retailers. For many years, its annual sales volume did not exceed $300,000. In 1960, Textile decided to enter the field of consumer sales and, accordingly, for the first time, it fashioned its advertising to attract individual buyers. In 1961 it embarked upon a new business pursuit called "wholesalers service," which was designed to help subscribers procure goods at wholesale prices. Textile was dissolved in 1962 and its operations were taken over by the corporate petitioners. By 1964 the annual sales volume of the combined enterprise had climbed from $300,000 to more than $5,000,000.

Petitioner Jay Norris Corporation (Jay Norris) has continued the warehousing and sales operations formerly conducted by Textile. It operates exclusively through mail-order catalogs, and maintains no showrooms or other display facilities. Petitioner Federated Nationwide Wholesalers Service, Garydean Corp. (Wholesalers Service) has continued the buyers' service. It solicits, by mail, catalog subscriptions at both the retail and consumer levels. For $3, each subscriber to the service receives three wholesale catalogs (one of which is Jay Norris), three Jay Norris bonus coupons, and a list of companies, not affiliated with the petitioners, which also sell goods at wholesale prices. Advertisements circulated in quantity by Wholesalers Service prominently feature the name of Jay Norris, and have contributed substantially to the recent success of the petitioners' business.

The promotional literature describes the business as a wholesale operation, with emphasis on bargains, savings, and representations of "wholesale," "low wholesale," or "lowest wholesale" prices. For example, various catalogs and circulars distributed by the petitioners contain one or more of the following statements:

> "There are many wholesalers in this country who will sell to YOU!"; "BARGAINS ARE OUR BUSINESS!"; "YOU can pocket SAVINGS of up to 60%"; "Factory To You Prices"; "BUY YOUR NEXT CAR WHOLESALE AND SAVE UP TO $1,000!!"; "We sell at low wholesale prices"; and "Over 1,000 items at lowest wholesale prices GUARANTEED."

Such circulars are sent out by Wholesalers Service in volume, some being mailed nationwide to as many as 20 million people. Merchandise advertised and distributed by the petitioners is offered for sale at prices which are considerably below retail.

On November 10, 1964 the Federal Trade Commission instituted proceedings against the petitioners for alleged violations of § 5(a) (1) of the Federal Trade Commission Act.[1] The complaint set out, as "typical and illustrative," several statements and representations appearing in the petitioners' catalogs, circulars, and letters of solicitation to the effect that the petitioners were wholesalers and that their merchandise was being offered at wholesale prices. It charged that "in truth and in fact" the petitioners "are not wholesalers, nor do they offer to sell, or sell, many of their articles of merchandise at wholesale prices but, to the contrary, the prices of many such items are in excess of wholesale prices." In addition the complaint alleged that the

---

1. Section 5(a) (1) of the Federal Trade Commission Act makes unlawful any "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." 15 U.S.C. § 45(a) (1).

Wholesalers Service was "not providing a wholesalers' service and * * * [did] not in many instances assist purchasers to buy at wholesale prices," as it represented.

Without objection from the parties, the Trial Examiner, who conducted the hearings, defined "wholesale" to mean the sale of merchandise either for resale or for use in business or as equipment,[2] and "wholesaler" to mean simply one who sells merchandise at wholesale. He found as a fact that 60% of the petitioners' merchandise sales were made to the ultimate consumer, but that the remaining 40% were made to persons who purchased for resale, and therefore qualified as wholesale transactions. In effect, his conclusion was that the petitioners were carrying on a substantial part of their business as "wholesalers" and consequently their representations to this effect were not materially misleading or deceptive.

The examiner recognized the fact that in general there is no single, fixed "wholesale price" for an item of merchandise, but that several distinct "wholesale prices" may be paid by different retailers to various suppliers for the same product.[3] Because of this he ruled, without opposition from the complaint counsel, that a representation of "wholesale price" would not be deceptive unless the price actually charged for the item so advertised were to exceed any and all of the existing wholesale prices

for the goods, excluding only those prices which could not be said to represent bona fide charges for the merchandise. On a view of all the evidence, the examiner concluded that counsel had failed to meet this burden of proof, and recommended that the complaint be dismissed.

On appeal the Commission disagreed with the findings and conclusions of the trial examiner and set them aside. After a review of all the evidence it made new findings, concluded that the Act had been violated, and ordered the petitioners to cease and desist.[4]

The Commission defined the term "wholesaler" to include any merchant who sells to middlemen rather than to consumers.[5] This meant that the petitioners functioned partly as wholesalers and partly as retailers, despite the fact that in both channels they probably sold at substantially less than retail prices. When such a hybrid enterprise unqualifiedly characterizes itself as a "wholesaler" in literature designed to appeal primarily to consumers, deception may be found to occur.

The Commission rejected the theory that a representation of "wholesale price" could be deceptive only if the price actually charged exceeded the whole range of bona fide wholesale prices for a particular item of merchandise. Where such a representation is made to a consumer, as opposed to a merchant or tradesman, it reasoned, there is likely to be deception in any case where the price

---

2. "Wholesale" means "to sell merchandise, usually in quantity, lots, to one who intends to resell it in one form or another, or to use it for business needs as supplies or equipment."

3. The term "wholesale price" is generally defined as the price which a retailer pays to its source of supply when purchasing goods for resale to the ultimate consumer. See, e.g., Guess v. Montague, 51 F.Supp. 61 (D.C.S.C.1942). Where a manufacturer maintains multiple systems or channels of distribution, all retailers may not pay the same prices to their direct sources of supply.

4. No direct evidence was offered to establish the charge against Wholesalers Serv-

ice that it did not actually assist purchasers to buy at wholesale prices. The Commission accepted the examiner's recommendation that this allegation of the complaint be dismissed.

5. This definition is consistent with the one used by the trial examiner, and is fully supported by the case law. Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 227 F. 46, 47–48 (2 Cir. 1915); Mennen Co. v. F. T. C., 288 F. 774, 782 (2 Cir.), cert. denied, 262 U.S. 759, 43 S.Ct. 705, 67 L.Ed. 1219 (1923); L. & C. Mayers Co. v. F. T. C., 97 F.2d 365, 366–367 (2 Cir. 1938).

actually charged exceeds what retailers in the area normally pay their sources of supply for the same item. According to the Commission, this "usual and customary" price [6] marks the level of wholesale price at which deception begins in a consumer oriented business such as that run by the petitioners.

After a review of the evidence, the Commission found that the prices charged by the petitioners in five of the six product lines tested before the trial examiner [7] exceeded the "usual and customary" prices for the merchandise, and, in two of those lines, also exceeded any bona fide wholesale price. Accepting the examiner's finding that 60% of the petitioners' sales were made to consumers, it reasoned that the enterprise was acting primarily as a retailer, rather than a wholesaler. On these facts, it concluded that the petitioners had engaged in deceptive trade practices by offering merchandise for sale at "wholesale," "low wholesale," and "lowest wholesale" prices, and by representing in their advertising and otherwise that they were "wholesalers."

In this court the petitioners advance a two-pronged attack on the Commission's decision and order. First they claim that issues dealing with "usual and customary" prices and with "lowest" wholesale prices were prejudicially added to the case by the Commission after the hearing was concluded and without notice to the petitioners, and that those findings of the Commission, and that portion of its cease and desist order, which utilize these terms, are not supported by substantial evidence on the entire record. The second contention goes to the form of the Commission's cease and desist order.

■ We are satisfied that, as to most of the evidence adduced, the petitioners' position was not prejudiced by the post-hearing narrowing of the relevant measure of deception from "any bona fide" wholesale price, to the "usual and customary" price paid by retailers, that this portion of the proof amounts to "substantial" evidence, and that the Commission's finding of deception in terms of the "usual and customary" price concept should therefore be sustained.

The record before us fully supports the Commission's conclusion that items in the Spalding "regular" line, which is carried by the petitioners, are distributed by the manufacturer directly to retailers only, and at a single set of prices. As a consequence of this, there is but one "wholesale" price for any item in the Spalding "regular" line sold in the country. The evidence clearly shows that the prices charged by the petitioners for items in the Spalding "regular" line are uniformly higher, although by modest amounts, than the prices paid by retailers to Spalding. Their representations of "wholesale prices," therefore, are deceptive both under the standard used by the examiner, and that adopted by the Commission.

The same situation exists as to merchandise of Westinghouse manufacture except that there the prices paid by retailers vary slightly by geographic location throughout the country. With only minor exceptions, however, the evidence

6. The Commission defined usual and customary prices as follows:
   "Where there are several wholesale prices for the same line of products, the prices usually and customarily paid by retailers will be the prices paid by the group of retailers whose purchases constitute the largest percentage of the manufacturer's total dollar volume of sales. If the manufacturer sells directly to retailers on an extensive basis and relies only secondarily on distributors and wholesalers for distribution, the prices usually and customarily paid by retailers will be the prices which the manufacturer charges retailers in such direct sales. However, if the manufacturer relies principally on distributors or wholesalers for the distribution function, the prices usually and customarily paid by retailers will be the prices which distributors or wholesalers charge retailers."

7. These are items produced by A. G. Spalding Bros., Westinghouse Electric Corp., Regal Ware, Inc., Amity Leather Products Co., International Appliance Co., and Mastercraft Pipes, Inc.

adduced shows that the petitioners' prices are somewhat higher than those paid by retailers to Westinghouse.

Unlike the Spalding and the Westinghouse merchandise, items in the Regal Ware line carried by the petitioners sell at a variety of wholesale prices because a number of marketing distribution channels are utilized by the manufacturer and because prices paid by retailers in different channels vary according to a particular retailer's direct souce of supply. On substantial evidence, however, the Commission found that 80% of Regal Ware's sales are made directly to retailers, so that prices paid in this primary channel of distribution constitute the "usual and customary" prices for the goods. See note 6, supra. The record also shows that the petitioners' prices on Regal Ware items are generally higher than those "usual and customary" prices. No claim has been made that the Commission's essential finding of 80% was in error.

■ As to these three lines (Spalding, Westinghouse, and Regal Ware), then, it is perfectly clear that the evidence relied upon by the Commission in drawing its conclusion that the petitioners' representations of "wholesale prices" were deceptive and misleading to consumers was substantial, and that its reliability was in no way diminished by the shift in legal standard effected in the Commission's opinion. Substantial evidence encompassing three multiple-item product lines, while not an overwhelming quantum of proof, is sufficient to support a properly drawn cease and desist order.[8] Cf., Hoving Corp. v. F. T. C., 290 F.2d 803, 806 (2 Cir. 1961).

■ The petitioners also claim that they were unfairly treated by the Commission because they were not given notice that they were being accused of misrepresentation in advertising that their charges for various items were the "lowest wholesale prices." The simple answer to this argument is that wherever the Commission showed that the petitioners' representations of "wholesale price" were false and deceptive, it ipso facto proved that the assertion of "lowest wholesale prices" was likewise false and deceptive. Even assuming that the complaint gave them inadequate notice that such an accusation would be made, there is no conceivable way in which the petitioners having been given full notice, could have improved their defense and they therefore suffered no prejudice. Under these circumstances the Commission clearly had the power to frame its cease and desist order to cover all the unlawful conduct proven.

We come now to the petitioners' more substantial second argument which is directed to the scope and form of the Commission's cease and desist order, especially to paragraph (2) thereof, which deals with representations that the petitioners are "wholesalers," or that they sell merchandise at either "wholesale" or "low wholesale" prices.[9] This portion of the

---

8. We choose not to rely on the Amity evidence for the reason that, had the petitioners been aware at the time of the hearing of the precise legal standard which the Commission would employ, they might have been able to prove that non-drug retailers in fact provided the primary distribution channel for Amity items. Generally the petitioners' prices were equal to those charged by non-drug retailers, and under the Commission's standard, would not exceed those "usually and customarily" charged by retailers for Amity items.

The evidence of sales of International products, which concerned only a few sales in New York City, is of minor significance; and the Commission itself chose not to rely on the proof offered with regard to Mastercraft items.

9. Our conclusion that the Commission properly held that the petitioners' representation of "lowest wholesale prices" violated the Act suffices to sustain paragraph (1) of the order which proscribes such representations as to an article of merchandise "unless the article is being offered for sale at the lowest price paid by retailers for such merchandise to any source of supply," and as to the form of which the petitioners have raised no objections.

Little has been said here about paragraph (3) of the order which requires

order requires the petitioners to cease and desist from:

"2. Representing, directly or by implication, in any advertising, including all advertising circulars, lists of wholesalers, or catalogs distributed by [Wholesalers Service], or otherwise representing, directly or by implication, that [petitioners] are wholesalers, or that they sell articles of merchandise at wholesale prices, or at low wholesale prices: *provided,* however, that it shall be a defense in any enforcement proceeding under this order for [petitioners] to show:

(a) that they make a substantial and significant number of sales to retailers in the ordinary course of business, and

(b) that the prices represented to be wholesale, or low wholesale, prices do not exceed the prices usually and customarily paid by retailers for such merchandise to any source of supply, when purchased in the quantity offered for sale by the [petitioners]."

The plain words of paragraph (2) of the order make it unlawful for the petitioners to represent in any of their literature that they are wholesalers, or that their prices are wholesale or low wholesale (regardless of the truth or falsity of the representation); but in the proviso this is qualified so that if the Commission should bring an enforcement or penalty proceeding against them because of an alleged violation, the petitioners may prove in defense that their representations were substantially true and not deceptive, within the standards set out in subdivisions (a) and (b).

We are aware of no precise precedent in the case law for the form of order which the Commission has here chosen to impose. The petitioners argue that paragraph (2) will, in an enforcement proceeding, effect a shifting of the burden of proof from the shoulders of the Commission, where it normally rests, to the shoulders of petitioners, where the law says it does not rest, see Western Radio Corp. v. F. T. C., 339 F.2d 937, 940 (7 Cir. 1964), cert. denied, 381 U.S. 938, 85 S.Ct. 1770, 14 L.Ed.2d 701 (1965); the Commission, however, asserts that it is nothing more than a permissible provision for an "escape" from the harshness of the unqualified prohibition. See Colgate-Palmolive Co. v. F. T. C., 326 F.2d 517, 523 (1 Cir. 1963), rev'd on other grounds, 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965).

Providing some alleviation from the rigors of an order, unjustifiably barring the petitioners from the use in a sizeable part of their business of the word "wholesale" and its derivatives, does not cure the error. Moreover, the petitioners are granted nothing by the proviso that they would not have anyway, not as a matter of grace from the Commission, but as a right, under the law, to interpose a defense. Calling it an "escape" does not change its nature. The order, which in no way took into account the truthfulness of the representation, or the fact that 40% of the petitioners' sales are made to retailers and are therefore wholesale transactions, cannot be justified on the present record. Certainly in their dealings with retailers the petitioners do not act unlawfully by representing that they are wholesalers, which is true,

the petitioners to cease and desist from "misrepresenting in any manner the amount of savings available to purchasers of [their] merchandise." The Commission proceeded on the assumption that a representation that wares are being offered for sale at "wholesale" prices, when in fact they are being offered at prices which are either not wholesale or which are "high" wholesale, impliedly misrepresents the amount of savings obtainable by a consumer who patronizes the seller.

Cf., L. & C. Mayers Co. v. F. T. C., 97 F.2d 365 (2 Cir. 1938). Even so, there is no proof that any of the specific statements made by the petitioners in their advertising, which expressly used the word "savings," e.g., "YOU can pocket SAVINGS of up to 60%," were in any respect false, misleading, or deceptive. Because the record does not support such a conclusion, paragraph (3) of the order cannot be sustained and it is set aside.

or that they are charging wholesale prices, when in fact the figures are not in excess of those which are usually and customarily paid by retailers for the items advertised. The wording and inclusion of the proviso indicate that the Commission itself recognized as much, and strongly suggest that the intention behind the provision was to relieve the Commission of the burden of proving that the petitioners' prices exceeded what is "usual and customary."

Research discloses no case dealing with a precise equivalent of the reverse-burden-of-proof order with which we are faced. In Western Radio Corp. v. F. T. C., supra, the Commission's order required the manufacturer of a pocket-sized portable radio transmitter to cease and desist from making certain statements about the merits of its product unless it established that the claims were true. The company complained of a shifting of the burden of proof to it in some later proceeding charging a violation of the order. Construing the order "to mean no more than that petitioners must not speak falsely in advertising their transmitters," the Seventh Circuit, therefore, did not squarely face this problem; and it said by way of dictum: "We do not anticipate that some court at some future time will regard this order as changing the ordinary rules as to the burden of proof." 339 F.2d at 940.

■ The present order is too explicit to be subject to a validating interpretation and it is necessary to decide the point that the Seventh Circuit left open. We hold that the Commission exceeded its remedial powers in imposing an order which shifts the burden to the petitioners in a subsequent enforcement or penalty proceeding.

■ The broad discretion which the Commission concededly has in fashioning appropriate orders to cope with unfair trade practices, see F. T. C. v. Colgate-Palmolive Co., 380 U.S. 374, 392, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965), is not absolute and does not immunize from review an order such as this one which sweeps across lawful and unlawful behavior without distinction. While we agree that "those caught violating the Act must expect some fencing in," F. T. C. v. National Lead Co., 352 U.S. 419, 431, 77 S.Ct. 502, 510, 1 L.Ed.2d 438 (1957), we cannot sanction a remedy which leaves open no path on which they can "travel without anxiety," [10] United States v. St. Regis Paper Co., 355 F.2d 688, 697 (2 Cir. 1966), and in no event is the Commission warranted in decreeing what in effect is clearly a shifting of the burden of proof from itself to the petitioners. Compare NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377 (1953); and see Jaffe, The Judicial Enforcement of Administrative Orders, 76 Harv.L.Rev. 865, 873–874 (1963).

The order should be modified so that it will prohibit the petitioners from representing that they are wholesalers, or that they sell merchandise at wholesale or low wholesale prices, unless they in fact (a) make a substantial and significant number of sales to retailers and (b) sell items which they offer at wholesale or low wholesale, at prices which do not exceed those usually and customarily paid by retailers for such merchandise.[11]

■ The petitioners question the fairness of the Commission's order, even as

---

10. As Commissioner Elman stated in dissent in the present case: "The Commission should not lay down a flat and unqualified rule prohibiting a hybrid wholesaler-retailer, in all circumstances, from using the terms 'wholesale' or 'wholesale price' in his advertising, even where he does so truthfully and honestly."

11. No useful purpose would be served in remanding the case to the Commission so as to afford it an opportunity to reconsider its order with particular reference to the hybrid form of the petitioners' business because, as the Commission correctly noted, the petitioners "have never attempted to separate prospective customers who are consumers from those who are retailers, and there is no indication that they are able to do so."

modified, on two further grounds. First, they claim that the reference therein to "substantial and significant" sales to retailers is vague and uncertain. We disagree. Cf., Heavenly Creations, Inc. v. F. T. C., 339 F.2d 7, 9 (2 Cir. 1964), cert. denied, 380 U.S. 955, 85 S. Ct. 1089, 13 L.Ed.2d 972 (1965), where the use of the word "substantial" in a Commission order was approved. The real reason for the adverse criticism of this phrase on the part of the petitioners seems to be a concern that its use in the present order may have been intended to imply that the petitioners' present volume of sales to retailers ($2,000,000 or 40% of their business) is insubstantial and insignificant. But there is no basis for apprehension in this regard, nor can it be doubted that the Commission would hold that a verified 40% figure would be a substantial and significant percentage. At most the order reflects the Commission's suspicion, not entirely unjustified on the present record, that the petitioners' sales to retailers may not in fact amount to the claimed 40%.

█ The petitioners also assert that as a practical matter they are unable to determine what are "usual and customary" prices paid by retailers to their sources of supply because neither wholesalers nor retailers, in competition with the petitioners, will divulge to them such confidential price data. At least in those situations where retailers purchase merchandise from wholesalers or other middlemen, rather than directly from the manufacturers, we agree with the petitioners that there may be no practical manner in which they can ascertain the precise amounts paid by these retailers. But there should be no great difficulty in finding out the price charged by manufacturers to wholesalers for a particular item to which the petitioners may add the usual and customary percentage of mark-up, concerning which the Commission should be able to refer the petitioners to acceptable sources of information.

The difficulties which the petitioners foresee here are perhaps more serious than those asserted in decisions which have upheld the use of the "usual and customary" price terminology in Commission orders, such as Giant Food, Inc. v. F. T. C., 116 U.S.App.D.C. 227, 322 F.2d 977, 987 (1963), appeal dismissed pursuant to Rule 60, 376 U.S. 967, 84 S. Ct. 1121, 12 L.Ed.2d 82 (1964), and cases cited therein at n. 26, and in which the parties subject to the order were required to determine the prices *charged* by, rather than *paid* by, competing retailers. But at least where, as here, there is nothing in the record to indicate the frequency with which these problems will arise in the future, it would be inappropriate to recognize what may prove to be only "hypothetical" fears of the petitioners as an absolute bar to an otherwise proper order. F. T. C. v. National Lead Co., supra, 352 U.S. at 431, 77 S.Ct. 502. In the event that the hardship which the petitioners anticipate proves to be actual rather than imaginary, they may seek definite advice from the Commission, and at that time may propose possible solutions of their own. See F. T. C. v. Colgate-Palmolive Co., supra, 380 U.S. at 394, 85 S.Ct. 1035; Regina Corp. v. F. T. C., 322 F.2d 765, 770 (3 Cir. 1963). There is no reason for us to believe now that the Commission would be inclined for any reason to act in a "literalistic and arbitrary fashion" in connection with such a request, as the petitioners fear may happen, Heavenly Creations, Inc. v. F. T. C., supra, 339 F.2d at 9.

We have considered the other contentions raised by the petitioners and find them without merit. The order was properly extended to Wholesalers Service which actively participated in the distribution of the deceptive literature, as well as to the individual petitioners, Jacobs and Williams, who at all relevant times were officers of, and controlled the practices of, the corporate petitioners.

The Commission will modify its order in compliance with this opinion and, as modified, enforcement of the order is granted.