241 F.Supp. 476 (1965)
BERGJANS FARM DAIRY CO., Ozark Dairy Company, Patke Farm Dairy, Inc., the Dairy Maids, Inc., the North Hills Dairy Company, Woodlawn Farm Dairy Co., Plaintiffs,
v.
SANITARY MILK PRODUCERS, Clarence B. Palmer, Karl B. Althage, R. D. Pennewell, Russell Spaulding, Defendants.
No. 62 C 316(2).
United States District Court E. D. Missouri, E. D.
March 26, 1965.
*477 *478 Riddle, Baker & O'Herin, Malden, Mo., Gray L. Dorsey, Chesterfield, Mo., for plaintiffs.
Wilburn A. Duncan, Wayne B. Wright, St. Louis, Mo., for defendants.
MEREDITH, District Judge.
This is a case brought by six small dairy processors against a dairy producers' cooperative and four individuals. The plaintiffs, all corporations, are Bergjans Farm Dairy Co., Inc., Ozark Dairy Company, Inc., Patke Farm Dairy, Inc., The Dairy Maids, Inc., The North Hills Dairy Company, Inc., and Woodlawn Farm Dairy Company. The defendants are Sanitary Milk Producers, Inc., General Manager Russell Spaulding, President Clarence B. Palmer, Treasurer Karl B. Althage, and Director R. D. Pennewell. Plaintiffs allege violations of sections 1 and 2 of the Sherman Act, and of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. Defendant Sanitary Milk Producers counterclaims on a common law conspiracy to interfere with business relations, violation of section 1 of the Sherman Act and violation of the Non-Profit Cooperative Marketing Law of Missouri (R.S.Mo. 274.270, V.A.M.S.). Jurisdiction is under sections 4 and 16 of the Clayton Act. The jury heard the case on the question of damages and the Court for the purpose of an injunction.
Defendant Sanitary Milk Producers (hereinafter called Sanitary) is an Illinois corporation organized under the Agricultural Cooperative Act of that state and authorized to do business in the State of Missouri, and transacting and doing business in the Eastern Division of the Eastern District of Missouri, and having offices and agents for the transaction of business in the City of St. Louis, Missouri. Russell E. Spaulding is the General Manager of defendant Sanitary, and can be found within said district. Clarence B. Palmer is the President of defendant Sanitary, and resides and can be found within said district. Karl B. Althage is the Treasurer of defendant Sanitary, and resides and can be found within said district. R. D. Pennewell is a director of defendant Sanitary, and resides and can be found within said district.
For many years prior to December 1961 defendant Sanitary had been engaged solely in assisting its members in marketing their raw milk, selling to dairies in the St. Louis area for them to process for consumption as fluid milk or to manufacture as dairy products. Prior to December 1961 Sanitary had no facilities for processing fluid milk, but had receiving plants in Missouri and in Illinois, as well as facilities for cooling, storing, manufacturing, and transferring milk.
Under regulation by the United States Department of Agriculture, each dairy farmer or producer receives one price for his milk sold to regulated handlers, regardless of what the handler does with it. It is a blend price determined by the Market Administrator according to the total amount of locally produced milk sold in Class I and the total amount sold in Class II, and the prices for those uses established by an order issued by the Secretary of Agriculture. The local Federal Milk Market Administrator announces each month the Class I and Class II prices as calculated per order of the *479 Secretary of Agriculture. All raw milk processed for consumption as fluid milk is in Class I; raw milk used in manufactured dairy products, such as ice cream, butter, cheese, etc., is in Class II. The Class I price is higher than the Class II price by perhaps 40% or more.
The dairy farmers collectively naturally want to have as much as possible of the milk produced in the St. Louis area sold at the more profitable Class I price. The sale in the St. Louis area, for Class I use, of milk brought in from beyond this market area results in an increase of the percentage of local producers' milk sold at the less profitable Class II price. It is, therefore, to the advantage of all local producers to prevent the importation of milk and to sell in Class I use all locally produced milk before milk from any other area is purchased for that purpose.
In the period immediately prior to December, 1961, the Class I sales of milk processors in the St. Louis area were not satisfactory to the management and members of defendant Sanitary. Adams Dairy Company, and other processors, were bringing milk in from other market areas and were refusing to accept a full supply contract from defendant Sanitary.
On or about December 1, 1961, defendant Sanitary purchased the processing plant of Quality Dairy of O'Fallon, Illinois, and began processing some of the milk of its own members and selling processed milk in Illinois and in St. Louis and in St. Louis County. Members of other dairy cooperatives who had been supplying milk to Quality of O'Fallon were cut off as suppliers and only members of Sanitary Milk Producers were allowed to serve the new processing division of Sanitary. Defendant Spaulding made an announcement that the purchase was designed to forestall importation of more milk from outside the St. Louis area which might occur if a non-local processor bought the plant, to increase the bargaining power of Sanitary, and to get more Class I sales for its members.
Quality of O'Fallon had been selling milk at wholesale to stores in Illinois, in East St. Louis and elsewhere, and had been supplying Schnucks Markets in St. Louis. It had been selling Tomboy Stores on the east side but had not been selling Tomboy Stores in St. Louis and St. Louis County.
Early in 1962 defendant Spaulding announced that its Quality of O'Fallon division would sell milk under private label to all or nearly all of the Tomboy Stores of St. Louis and St. Louis County. Adams Dairy announced that it would meet all price competition whether from private label or brand name milk. Defendant Sanitary was selling at 32¢, several cents under the wholesale price most processors were then charging in St. Louis. When Adams met this price, Sealtest, Pevely, and Quality, and then the small dairies, including plaintiffs, had to meet it. This destroyed the price advantage upon which Sanitary was counting to gain a large volume of sales for its processed milk through supermarkets in St. Louis and St. Louis County.
On or about March 1, 1962, defendant Sanitary attempted to regain the advantage by dropping its price to 30½¢ and then to 29½¢, but Adams, the other major dairies, and then smaller dairies, followed Sanitary. On or about May 7, 1962, in an effort to get the desired differential by deception, defendant Spaulding announced that Sanitary would charge 35¢ for a half-gallon of whole milk in a paper carton. The major dairies and the small dairies raised to 35¢. Defendant Sanitary, in fact, did not raise its price, but gave 5¢ differentials in secret cash rebates in brown envelopes to most of its customers in St. Louis City and County and to some of its customers on the east side. This deception would not have worked if the customers who in fact were still buying at about 30¢ a half gallon had not raised their retail price for milk. The favored stores did raise their retail price on milk from Sanitary on or about May 7, 1962, going from a retail price of two for 69¢ *480 to two for 79¢. Tomboy Stores, Inc., sent a flier to all their stores announcing that the retail price would be two for 79¢ and stating that no deviation would be tolerated. This price increase was contrary to individual self-interest of the retail stores. Milk is an effective loss leader item. A low price on milk is used to attract customers into the store, where they may purchase their whole market basket. The lower price on Sanitary milk would have enabled Sanitary's supermarket customers to undersell other stores and gain a substantial advantage in volume of customers. The rise in retail price was vital to defendant Sanitary. Unless the retail stores raised their price to reflect the supposed increase by defendant Sanitary, the deception would have been immediately discovered and the other processors would not have charged 35¢. Late in July or early in August, 1962, the deception of defendant Sanitary was discovered and the other processors lowered their price to meet the price that Sanitary was actually charging. In 1962 and all through 1963, the price war continued in St. Louis. The battle was particularly strong between Adams Dairy Company and Sanitary. Adams was the trigger that set off the opposition of the whole industry to defendant Sanitary's predatory pricing practices. Defendant Sanitary could not build up volume for processed milk and thus increase sales at the Class I price for its producer members in the supermarkets in St. Louis so long as Adams Dairy met every price that Sanitary charged. Sanitary could continue to sell at a lower price in St. Louis and St. Louis County than it was charging many of its customers on the east side and throughout other areas of Illinois, yet the advantage of a price differential in St. Louis and St. Louis County could not be attained so long as Adams met every price and the other major dairies and the smaller dairies had to meet Adams' price.
Defendant Sanitary was, at the same time, exerting pressure on Adams Dairy. Defendant Sanitary wanted Adams to stop buying milk from outside the St. Louis market area. Defendant Sanitary had control of over 55% to 60% of raw milk in the area. As a processor it could use the economic power gained from this monopolistic position in raw milk to cut the price of processed milk and to destroy profits on the sale of processed milk by any competing processor. This two-way pressure as both competitor and supplier caused Adams Dairy after several months to complain about the predatory practices of Sanitary Milk Producers to the Attorney General of Missouri.
During 1962, and in 1963, defendant Sanitary assured a substantial volume of Class I sales for its members by bidding low enough to get the milk and other dairy products contract for Scott Air Force Base at Belleville, Illinois. On this contract defendant Sanitary sold milk as low as 24.9¢ and 24.8¢ for a half-gallon of homogenized milk in paper cartons. Volume averaged about 70,000 half-gallons a month.
On or about January 1, 1964, defendant Sanitary purchased the assets of Adams Dairy Co., and began processing and selling out of the Adams plant. Producers previously supplying Adams who were not members of defendant Sanitary were required to become producer members of defendant Sanitary or cease selling to Adams, now a division of defendant Sanitary. This flat was applied even if the supplier was a member of another producer cooperative.
Purchase of Adams removed the most stubborn obstacle to accomplishment of defendant Sanitary's purposes in the fluid milk market in St. Louis and St. Louis County. It gave defendant Sanitary substantially greater control over importation of raw milk from outside the area. It wiped out the trigger that had caused all of the major milk processors and all of the small milk processors to meet defendant Sanitary's every price and prevent it from attaining the price differential by which it hoped to penetrate the market in processed milk in St. Louis and St. Louis County. After this purchase, the price of processed milk in *481 St. Louis and St. Louis County rose to about the same level as before the price war started by defendant Sanitary on or about March 1, 1962. These prices ranged from 35 to 37¢. However, Sanitary had accomplished its objective. It maintained a 2¢ differential on its private label milk out of the O'Fallon plant even as against its own milk sold out of the Adams plant in St. Louis. In three days' testimony, defendant Sanitary failed to meet the burden of proving any of the three counts of the counterclaim. They showed that some of the plaintiffs belonged to the Independent Milk Processors of Missouri, but they produced no evidence that association had any improper purposes, or that any of its members took part in any actions to stop defendant Sanitary from entering into the processing business or to interfere with the marketing contract between Sanitary and its members.
On February 10, 1965, the jury returned the following verdicts:
On Count 1 of the complaint, which alleged a violation of section 1 of the Sherman Act, a conspiracy to restrain trade by fixing prices, in favor of all the plaintiffs and against defendants Sanitary Milk Producers, Karl B. Althage, and Russell Spaulding.
On Count 2 of the complaint, which alleged a violation of section 2 of the Sherman Act, an attempt to monopolize, in favor of all the plaintiffs and against defendants Sanitary Milk Producers, Clarence B. Palmer, Karl B. Althage, R. D. Pennewell and Russell Spaulding.
On Count 3 of the complaint, which alleged a violation of section 2 of the Sherman Act, a conspiracy to monopolize, the jury found in favor of all defendants and against all plaintiffs.
On Count 4 of the complaint, which alleged a violation of sections 2(a), 4 and 16 of the Clayton Act, as amended by the Robinson-Patman Act, unlawful price discrimination, the jury found in favor of all plaintiffs and against defendants Sanitary Milk Producers and Russell Spaulding.
The jury found in favor of all plaintiffs and against the defendant Sanitary Milk Producers on all three counts of the defendant Sanitary Milk Producers' counterclaim.
The award in actual damages found by the jury on all three counts was in the following amounts for the following plaintiffs:

Bergjans Farm Dairy $ 4,000
Ozark Dairy Company 12,000
The North Hills Dairy Company 2,500
Patke Farm Dairy 3,000
The Dairy Maids 4,000
Woodlawn Farm Dairy Company 13,000
 _______
 Total award $38,500

This award will be trebled to $115,500.

Conspiracy to Restrain Trade By Fixing Prices
Defendant Spaulding was the general manager of Sanitary. William Schwarz, manager of the Quality of O'Fallon Division of Sanitary testified that he received orders from Spaulding to increase the price of milk the first part of May, 1962. Schwarz testified, as did Spaulding, that Spaulding did not know about the cash rebates at the time they were first given. However, it is clear from testimony of Schwarz, Spaulding, and of accountant William A. Huber, that Spaulding knew of these secret cash rebates within a few days. They appeared on the books as "advertising". This was approved by Schwarz, by Spaulding, and accepted by Huber's accounting firm. The financial books and the disbursement of all funds were the responsibility of treasurer Althage. Over $16,000 was paid out secretly in cash rebates in a period of approximately seven weeks. Schwarz obtained the cash by writing checks made out to cash, cashing them at the bank, and distributing the money in brown envelopes. Althage testified that he did not know of this withdrawal at the time and, in fact, for many months thereafter, until it was revealed in depositions taken in the course of this trial. After Althage *482 learned that cash had been so drawn and paid, he testified that he thought the procedure was proper. Information supplied plaintiffs in interrogatories during the course of this trial stated that defendant Sanitary's wholesale price for milk in the period between May 7 and the 1st of August, 1962, was 35¢. The question asked was the price and terms of sale during the time period. The reduction of the price by 5¢ a half-gallon through secret cash rebates was not disclosed. No admission of these cash rebates was made by Spaulding, Schwarz, or other officers and agents and employees of Sanitary until elicited in answers to questions on depositions several months after the interrogatories with false price information had been filed. Defendant insisted even at trial that there was nothing illegal about this means of doing business. The testimony of both Spaulding and of Schwarz concerning the payment of cash rebates was evasive and cast doubt on their credibility insofar as this law suit is concerned. Schwarz even went so far as to testify that the decision to place approximately $16,000 paid out in cash rebates on the books of Sanitary Milk Producers as advertising, may have been made by an office girl. This is unbelievable and obviously an effort by Schwarz to shift blame for this action to another. The attempt at the time of trial to rehabilitate the payment of these rebates into a straight forward business transaction was unsuccessful and the failure of the defendants to correctly answer the interrogatories and the failure to disclose the existence of cash rebates until months after the interrogatories had been filed, is such conduct that it casts doubt upon the evidence of the defendants in this case.
It was unnatural for the favored customers of defendant Sanitary to raise their out-of-store price by five cents a half gallon when the wholesale price to them had not been increased. Action against self-interest is strong evidence of a conspiracy. The stores' price increase was inconsistent with their self-interest, and in the absence of a valid explanation (and defendants produced none) is inconsistent with decisions independently arrived at. Milgram v. Loew's, Inc., 192 F.2d 579 (3rd Cir. 1951), cert. den. 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952). An illegal agreement, combination or conspiracy may be inferred from actions or course of dealing or other circumstances. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). The burden of rebutting the inference of joint action is upon the defendants, Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). There is no need to inquire into the amount of commerce that in fact was restrained by an agreement to fix price. Price fixing is illegal per se. United States v. Socony-Vacuum Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). It is illegal for a supplier and his customer to combine and conspire to fix the customer's resale price. Dr. Miles' Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). An agricultural cooperative, such as Sanitary, has certain exemptions from the antitrust laws under sections 1 and 2 of the Capper-Volstead Act, and section 6 of the Clayton Act. However, these exemptions do not apply to actions of an agricultural cooperative with respect to other non-cooperative corporations or individuals and as to these an agricultural cooperative is subject to the antitrust laws the same as any other corporation or person. Maryland & Virginia Milk Producers Association v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). Corporate officers, directors and agents are personally liable for acts of the corporation that violate the antitrust laws if they participate in those actions or authorize them. Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945). The Court finds that defendant Sanitary, defendant *483 Althage, and defendant Spaulding, together with stores who received secret cash rebates combined and conspired to fix the retail price of milk from those stores in violation of section 1 of the Sherman Act. The Court further finds on the basis of their fabrication of evidence and their statements and demeanor during trial that there is reason to believe that these defendants would engage in price fixing in the future unless they are enjoined from doing so by this Court.

Attempt to Monopolize
Defendant Sanitary carried with it into the processing business the power of a monopoly, or near monopoly, position in raw milk in the St. Louis market order area. Its share varied from 55 to 60%. This gave it tremendous bargaining power. It could raise a fund of nearly a million dollars within a short time by virtue of the authority it had to withhold 3¢ per hundred pounds from payment to its members for raw milk. It could use these funds for any purposes of the association, being required only to return the money to the members within seven years, but without payment of any interest. Sanitary had great power with lending institutions. When Sanitary wanted to buy the Quality of O'Fallon processing plant, it obtained a one-million-dollar loan at a moderate interest rate without putting up any security whatever, simply by signing its name on a note. When, about two years later, it bought the Adams plant, it obtained more than two million dollars without security. This great bargaining power is contemplated by the Capper-Volstead Act. The exemption from the antitrust laws is designed to enable farmers, who had previously suffered from a lack of bargaining in the sale of their products, to form cooperatives in order to get better terms and prices for their produce. Therefore, defendant Sanitary's 55 to 60% control of raw milk in the St. Louis area was lawfully obtained. However, a lawfully-obtained power cannot be unlawfully used. Any use of monopoly power causes economic injury that the antitrust laws are designed to prevent. United States v. Aluminum Co. of America, 148 F.2d 416, 428-429 (1945). (Decided by the Court of Appeals of the Second Circuit under a Certificate from the Supreme Court.) However, when a monopoly power, whether gained lawfully under the Capper-Volstead Act, under the patent laws, or by virtue of a natural monopoly, is used unlawfully, it gives rise to a violation of section 2 of the Sherman Act and amounts to unlawful monopolization, or attempt to monopolize. Great economic power demands great responsibility in its use because the possibility of injury is so great. United States v. Aluminum Co. of America, supra. Sanitary used the economic power of its position as a producers' cooperative to acquire the Quality of O'Fallon plant. It then used the control over the Quality of O'Fallon plant to put itself in the position of being both a competitor with and a supplier to the milk processors in St. Louis and St. Louis County.
Defendant Sanitary used this dual position to pressure Adams Dairy and other processors to buy all of their milk supply from Sanitary. It put teeth in its demand by driving down the price for wholesale milk. It could either break or control, but did not have to compete on equal terms with, other processors. Defendant Sanitary used its position in the processing business to further the interests of its producer members to increase Class I sales by selling milk in large quantities under contract to Scott Air Force Base at prices extremely low, as low as 24.8¢ and 24.9¢. This was below the cost figures of Sanitary's own accountant who testified as to the cost study he had made of their prices at the dock. In addition, these low prices were given on milk that was not sold at the dock, but was delivered to Scott Air Force Base. Furthermore, there is serious doubt about the validity of the cost figures given by defendant Sanitary. The cost study was made with an eye to proving the validity of price after the members of the industry had made complaints *484 about Sanitary's selling at unreasonably low and below cost prices. It was a self-serving study. In addition, it was made by Mr. Huber, the accountant, whose firm, Gillies, Dwyer & Huber, St. Louis, Missouri, accepted and certified the accounts of the O'Fallon plant division of Sanitary, which showed that $16,000 in secret cash rebates in a period of seven weeks were "advertising". One of the statements concerning the Quality of O'Fallon plant at the time Sanitary bought it was that its milk was unadvertised and could be sold at a lower price for that reason. There had been no previous entry under advertising in the books of Quality of O'Fallon and none or very little appeared after that time. For this reason, the testimony of accountant Huber, and his cost study of the books of Quality of O'Fallon, is highly questionable. Expert testimony indicated that with normal operating costs, if the raw milk price of a half gallon of milk was between 19¢ and 20¢, that the delivered cost of milk would necessarily be far above the less-than 25¢ delivered price at which Quality of O'Fallon sold to Scott Air Force Base.
The losses occasioned by selling at below cost or unreasonably low prices to Scott Air Force Base and at prices of 29½¢ to 30½¢ to some of their customers in St. Louis and St. Louis County were made up by Sanitary by selling to other customers in East St. Louis and other parts of Illinois at prices ranging up to 35¢ all during the time that they were causing the price war in St. Louis. Some of these were large purchasers and directly in competition with other customers buying at the low prices. By this means they were building up funds in an area where they were not immediately trying to destroy competition and using those funds as a resource, together with the money they could get from their producer members without interest, to cut the prices in St. Louis and St. Louis County to an unreasonably low level in order to destroy competition.
Defendant Sanitary alleged that it was able to charge low prices because it was more efficient. If efficiency were the cause of Sanitary's low prices, it would mean that the firm could sell at the lower level indefinitely and to all of its customers and still realize a satisfactory profit. A price cut in one place with a raise later is the device of the monopolist.
It is as old as the practices of Standard Oil Company, which were exposed in the first of the great antitrust cases in 1911. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Defendant Sanitary attempted to increase its outlet for its members' milk at Class I prices through its own processing plant by increasing the volume of sales in retail stores in St. Louis and St. Louis County. Pursuant to this they combined, conspired and agreed with these stores to fix the resale price of the milk out of those stores. This is itself a violation of section 1 of the Sherman Act and it is a predatory act which shows evidence of intent to monopolize under section 2 of the Sherman Act and constitutes part of a pattern of action aimed at monopolizing.
The specific intent to monopolize is shown by statements of directors that they intended to process and sell all of the milk that they produced. This would give them control of 55 to 60% of the processed milk in the St. Louis area. Such control would be exempt from the antitrust laws under the Capper-Volstead Act if gained by lawful means. Nevertheless, the intent to gain that amount of control expressed by the directors of an organization which is at the time engaging in predatory acts, discriminatory pricing and other improper and illegal practices indicates that the intent was not only to attain it, but to attain it by any means, lawful or unlawful. The actions of defendant Sanitary, of defendant Spaulding, of defendant Althage, defendant Palmer, and defendant Pennewell, and the statements of defendant Spaulding show that these defendants did have specific intent to monopolize the market in raw and processed milk in St. Louis and St. Louis County by means not within *485 the exemption of the Capper-Volstead Act. The requirement was met that an attempt to monopolize requires a finding of specific intent to monopolize. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).
The intent to monopolize was exercised by Sanitary and by defendant individuals in a pattern of action aimed at controlling the market in raw milk and in processed milk so that the objective of increasing the Class I sales of producer-members of the cooperative could be realized to the greatest possible extent. Sanitary did not come into the milk processing business in good faith. It did not intend to sell its processed products on the basis of good products and good service. It came into the processing business as a device to serve the interests of its members as producers. Possibly the Capper-Volstead exemptions would immunize this predatory action if it had not been carried out by unlawful means. Nevertheless, its predatory nature was clear from the very beginning. Defendant Sanitary did not need to make a normal and healthy profit in the processing business. It could sell at cost or at a loss as a processor and still benefit its members by increasing their Class I sales. Even with these advantages it did not set a uniform low price. Instead it charged high prices where it could get them and charged predatory prices where it wanted to drive out competition. It did not seek more sales by fair means and honest economic values.
The great pressure that defendant Sanitary was able to generate against processors who were both customers and competitors was shown in the letter written by Adams Dairy Company, by its attorney, to the Attorney General of Missouri. The great pressure that defendant Sanitary could bring against its smaller customers is shown by the fact that one of these small dairies who originally joined in this action, later withdrew. In testimony, an officer of that company testified that they withdrew because they were afraid that Sanitary would cut off their raw milk supply. He pointed out that there is a clause in the marketing contract with each of its members that gives defendant Sanitary the right to arbitrarily order a member to transfer his milk from one processor to another.
When Sanitary could not get the differential it wanted in wholesale prices in St. Louis and St. Louis County because of the determined and continuing opposition of Adams Dairy Company, Sanitary bought out Adams. If it could not break or bully, it bought out all opposition. Shortly after that action, the price of milk at wholesale in St. Louis and St. Louis County began to come back to a normal level, as shown by average prices in expert testimony of prices in thirty-eight states.
To constitute an attempt to monopolize, there must be actions done with the specific intent to monopolize, which, if successful, would achieve monopoly power to control prices, exclude competitors, and control production. Kansas City Star Co. v. United States, 8 Cir., 240 F.2d 643, cert. den. 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). Monopolistic designs, as well as monopoly achieved, are violations of sections of the Sherman Act. Times-Picayune Pub. Co. v. United States, supra; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). The attempt to monopolize can be "any part of" interstate commerce. Lorain Journal Co. v. United States, supra. As the Aluminum Co. of America case, supra, clearly shows, when a firm holds monopoly power, any use of that monopoly power to increase and further its power, or to maintain it, when those actions are not inevitable, but are consciously done to increase or preserve the power constitute monopolizing. Sanitary had and has legally-acquired monopoly power, or near monopoly power in raw milk in the St. Louis market area. It is very strictly accountable for the uses of that power. When, in addition to using its great power for the purpose of increasing that power, it exercises predatory, discriminatory *486 and conspiratorial means to increase that power and by its pattern of acts and by its statements indicates specific intent to monopolize, the question cannot be in doubt.
The Capper-Volstead exemption from the antitrust laws does not apply to actions of an agricultural cooperative with respect to non-cooperative corporations or individuals. Maryland & Virginia Milk Producers Association v. United States, supra. Corporate officers, directors, and agents are personally liable for acts of the corporation that violate the antitrust laws if they participate in or authorize those actions. Hartford-Empire Co. v. United States, supra. General manager Spaulding, under direction and control of the board of directors was in general charge of all activities of Sanitary. The board of directors were in direction and control of the cooperative, had monthly meetings, considered reports upon and authorized the purchase of the Quality of O'Fallon and Adams Dairy plants, and approved operating policy as reported to them by the general manager. Palmer was president of the board of directors during the time covered by this action. Althage was treasurer. Pennewell had been president for many years prior to this time and was an active director. All three were present at the board meetings concerning the acquisitions, approved the policies of defendant Sanitary as reported to them by Spaulding. Althage was responsible, in addition, for all funds and for any disbursements. Defendants Spaulding, Palmer, Althage, and Pennewell participated in or authorized the acquisitions for unlawful purposes, the actions to control importation of raw milk, including pressure for full supply contracts with processor-customers, and the predatory acts of selling at unreasonably low or below cost prices to increase the volume of sales of defendant Sanitary's processed milk and increase the sale of members' milk at Class I prices. In addition Spaulding and Althage participated in or authorized the giving of secret cash rebates, and the price conspiracy with certain customer stores, and Spaulding participated in or authorized the giving of unlawful price discriminations.
The Court finds that defendants Sanitary, Spaulding, Althage, Palmer and Pennewell did attempt to monopolize the market in fluid milk in St. Louis and St. Louis County in violation of section 2 of the Sherman Act. The plan of actions culminating in the acquisition of a second processing plant, Adams Dairy Company, puts defendant Sanitary at the present time in its most powerful position to control prices and to control the sale of raw milk at Class I prices in St. Louis. The demeanor and testimony of the witnesses indicate that they have no intention voluntarily to relinquish this power or to cease using it in unlawful ways and for unlawful purposes. They will not stop unless they are stopped by an injunction of this Court.

Conspiracy to Monopolize
There was evidence of conspiracy to fix the wholesale price of processed milk in St. Louis and St. Louis County. At the time of the secret cash rebates there was a conspiracy or combination between defendants Sanitary, Spaulding and Althage with certain retail stores to fix the retail price of defendant Sanitary's milk sold out of those stores. There was evidence that defendant Sanitary and the individual defendants sought the help of these same stores in a conspiracy to fix the wholesale price of milk in the St. Louis market. However, the preponderance of the evidence did not establish that the help was ever given and that any conspiracy, combination or agreement was formed for this purpose. The Court finds that the allegation of the conspiracy to monopolize was not proven.

Unlawful Price Discriminations
There was ample proof that defendant Sanitary was charging different prices to more than two purchasers of milk of like grade and quality, both within St. Louis and St. Louis County and between Missouri purchasers and Illinois purchasers at approximately the same time. *487 More than one of the sales at the different prices were made in interstate commerce, so the actions were within the interstate commerce requirements of section 2(a) of the Clayton Act. Willard Dairy Corp. v. National Dairy Products Corp., 309 F.2d 943 (6th Cir. 1962). Defendants offered no evidence that the differences in price were justified by a savings in the cost of serving the favored customers. There was credible evidence to support an inference that the discriminatory prices would cause a reasonable probability or possibility of injury to competition, or of lessening of competition or tendency to create a monopoly, or that competition would be injured, prevented or destroyed with defendant Sanitary or defendant Sanitary's customers. F.T.C. v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). The evidence showed that profit margins are small in the wholesale milk industry. James F. Solzan, owner of Edward B. McClain Company, Memphis, Tennessee, accounting consultants to the Milk Industry Foundation and the United States Department of Agriculture, testified that the average profit on a half-gallon of milk is less than 2¢. Testimony also showed that mark-ups are small and that a high volume of turnover is necessary in order to realize a profit. Plaintiffs were forced to drop their prices for milk from 3¢ to 5¢ a half-gallon as a result of the price war caused by defendant Sanitary and defendant individuals pursuant to their monopolistic designs and the testimony showed that plaintiffs and other processors were seriously hurt by this loss of revenue.
A public statement by defendant Spaulding at the beginning of the price war in 1962 indicated that he knew at that time that the price reductions caused by defendant Sanitary would cause financial injury to the plaintiffs and other processors in the market. Several of the plaintiffs testified that if the price war had continued much longer, they would have had to go out of business. The evidence shows that defendant Sanitary's low prices in St. Louis and St. Louis County, which were subsidized by the high prices charged to some customers in Illinois, were causing actual present injury to the plaintiffs and would, if continued, very likely cause some of plaintiffs or other processors to go out of business or be so financially crippled that they would no longer be effective competitors. The requirement of reasonable probability of injury to competition was met. Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir. 1959); Anheuser-Busch, Inc., v. F.T.C., 289 F.2d 835 (7th Cir. 1961).
Defendants had the burden of proving that their discriminatory low prices were given in good faith to meet the equally low price of a competitor. Corn Products Refining Co. v. F.T.C., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945). F.T.C. v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945). They did not meet this burden. The defense covers only the meeting of competition in individual competitive situations and good faith would require that the defendant knew of a lower price offered by a competitor to that customer before he lowered his price. F.T.C. v. A. E. Staley Mfg. Co., supra; F.T.C. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).
Defendants introduced no evidence that they had specific information at the time about a lower price being offered to a customer or that any price reduction of theirs was in response to and based upon such knowledge. William Schwarz, manager of the Quality of O'Fallon division of Sanitary at one time testified that Schnuck's Markets had told them of a lower price offered them by two other dairies and that defendant Sanitary's price reduction on or about March 1, 1962, to Schnuck's Markets was to meet the lower price offered. However, on cross-examination Schwarz backed away from that statement so far that he could not remember whether the information about the lower offer had been given to him by Mr. Schnuck at the first of March, or whether it might have been in April, or possibly in May.
*488 The Court finds that defendants Sanitary and Spaulding violated section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, by the giving of unlawful price discrimination where the effect may be to lessen competition, tending to create a monopoly, or to injure, prevent, or destroy competition with Sanitary or one of its customers. In addition to the evidence recited above showing the likelihood of injury to competition, there is the further fact that these discriminatory prices were part of the pattern of attempting to monopolize. This shows that defendants Sanitary and Spaulding considered these practices helpful in gaining monopoly power and the belief of one who intends to do evil that a given course of action is calculated to accomplish it, may be accepted by the Court as evidence the actions will accomplish the evil.
Defendants offered no evidence which would show intention of voluntarily ceasing their discriminatory pricing policy. In fact, the evidence showed that at the time of the trial defendants were maintaining a price discrimination between their milk sold out of their O'Fallon plant, and their milk sold out of their Adams plant. This was outside the period of the suit, but shows continuing intent to violate the price discrimination law.

Injunction
The Court finds that defendant Sanitary and defendant individuals have engaged in unlawful conspiracy to restrain trade, have attempted to monopolize, and have given unlawful price discriminations to the injury of the plaintiffs. The defendants threaten to continue such unlawful actions. Plaintiffs have proved that these actions during the period of the suit injured them, and if continued might have driven some of them out of business. The Court finds that continuation of such acts by the defendants would seriously injure the plaintiffs, as well as other milk processors in St. Louis and St. Louis County.
Defendant Sanitary has unlawfully achieved and unlawfully used great economic power. Its acquisitions of the Quality of O'Fallon and Adams Dairy Processing Plants with unlawful intent and for unlawful purposes have greatly increased the power of defendant Sanitary in the fluid milk market in the St. Louis area. This added power is a continuing threat to processors and to other producers. The only complete solution would be to "pry open to competition a market that has been closed by defendants' illegal restraints". International Salt Co. v. United States, 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). An injunction in a suit by a private individual cannot correct completely a monopolistic situation caused by the unlawful action of defendants, but should open the market to competition in every way that is appropriate, because it is the purpose of the antitrust laws to prevent the accomplishment of an unlawful result by every means, and not by just the means found unlawful in that particular case.
"When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed. The usual ways to the prohibited goal may be blocked against the proven transgressor and the burden put upon him to bring any proper claims for relief to the court's attention." International Salt Co. v. United States, supra, l. c. 40, 68 S. Ct. l. c. 17.
The Court is not limited to prohibiting only the acts already found to be illegal, but may prohibit other actions if necessary in order to prevent one who has proved his intention to violate the law to completely relinquish the fruit of his violation and to refrain from accomplishing his desired unlawful ends by any other means. International Salt Co. v. United States, supra; F.T.C. v. National Lead Co., 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); Moog Industries, Inc. v. F.T.C., 238 F.2d 43 (8th Cir. 1956).

*489 Attorneys' Fees

The six plaintiffs here started this antitrust action asking for damages in five counts against nine defendants, asking for actual damages of $99,000, they recovered $38,500. The defendants filed a counterclaim in three counts. The plaintiffs also asked for injunctive relief. Four of the defendants were dismissed by plaintiffs before trial.
The plaintiffs are not entitled to attorneys' fees for the time their attorneys spent in defending the counterclaims, in seeking injunctive relief, in matters relating to defendants who were dismissed, or on counts on which no recovery was awarded.
Suit was filed on August 31, 1962. The trial began on January 11, 1965, and was concluded on February 10, 1965. The trial took seventeen trial days, including two days used for argument and the charge to the jury. One additional day was taken by Court and counsel in discussing the charge to the jury and making objections to it.
Counsel for plaintiff testified the total time spent on the litigation was 2,216 hours, of which 1,649 hours was time of senior counselors and 567 hours of associates. The reasonable rate per hour for senior counselors in the area for this type work is $40.00 per hour and from $25.00 to $30.00 per hour for associates. The time spent was calculated on the basis of an eight-hour day for all the time, except during January and February of 1965, which was on the basis of a twelve-hour day.
From the record before this Court, it is impossible to segregate the amount of time spent by plaintiffs' attorneys on matter for which they are entitled to compensation and those for which they have no claim.
The various aspects of awarding a reasonable fee may be found in the following cases: Union Leader Corp. v. Newspapers of New England, Inc., 218 F. Supp. 490 (D.Mass.1963); Osborn v. Sinclair Refining Co., 207 F.Supp. 856 (D.Md.1962); Milwaukee Towne Corp. v. Loew's Inc., 190 F.2d 561 (7th Cir. 1951); Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8th Cir. 1952); and Webster Motor Car Co. v. Packard Motor Car Co., 166 F. Supp. 865 (D.C.D.C.1955), appeal dismissed 100 U.S.App.D.C. 161, 243 F.2d 418 (1957), cert. denied 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38.
The Court will award an attorneys' fee to be assessed against all the defendants and for the plaintiffs in the sum of $12,850, to be allocated among the plaintiffs, basically in accordance with their recovery of damages, as follows:

 Bergjans Farm Dairy $1,350
 Ozark Dairy Company 4,000
 The North Hills Dairy
 Company 850
 Patke Farm Dairy 1,000
 The Dairy Maids 1,350
 Woodlawn Farm Dairy
 Company 4,300
 _______
 Total fee $12,850

This Court will enter judgment in accordance with the foregoing.